Jo-Ann **BYKOFSKY**, on her own behalf and on the behalf of her son, a minor, Shaw Bykofsky, as his guardian, Plaintiffs,

v.

The **BOROUGH OF MIDDLETOWN** et al., Defendants.

Civ. No. 75–74.

United States District Court, M. D. Pennsylvania.

Aug. 22, 1975.

Andrew F. Schneider, Middletown, Pa., for plaintiffs.

William M. Young, Jr., James H. Boser, McNees, Wallace & Nurick, Harrisburg, Pa., for defendants.

SHERIDAN, Chief Judge.

This is the first federal case to adjudicate the constitutionality of a nocturnal juvenile curfew ordinance. Despite the widespread prevalence of juvenile curfew ordinances, there is a surprising paucity of legal authority dealing with the validity of such enactments, there being no federal cases and relatively few state cases.[1]

1. The following state cases have upheld the validity of juvenile curfews: *In Re Carpenter*, 1972, 31 Ohio App.2d 184, 287 N.E.2d 399; *In Re C*, 1972, 28 Cal.App.3d 747, 105 Cal.Rptr. 113; *City of Eastlake v. Ruggiero*, 1966, 7 Ohio App.2d 212, 220 N.E.2d 126; *Thistlewood v. Trial Magistrate For Ocean City*, 1964, 236 Md. 548, 204 A.2d 688; *City of Portland v. Goodwin*, 1949, 187 Or. 409, 210 P.2d 577; *People v. Walton*, 1945, 70 Cal.App.2d Supp. 862, 161 P.2d 498; *Baker v. Steelton Borough*, 1912, 17 Dauph. 17. The following state cases have held juvenile curfews unconstitutional: *In Re Doe*, 1973, 54 Hawaii 647, 513 P.2d 1385; *City of Seattle v. Pullman*, 1973, 82 Wash.2d 794, 514 P.2d 1059; *Alves v. Justice Court of Chico Judicial District*, 1957, 148 Cal.App.2d 419, 306 P.2d 601; *Ex parte McCarver*, 1898, 39 Tex.Cr.R. 448, 46 S.W. 936.

Plaintiff, Jo-Ann Bykofsky, on her own behalf and on the behalf of her son, a twelve year old minor, Shaw Bykofsky, as his guardian, brought this action under the Civil Rights Act, 42 U.S.C.A. § 1983, and the Federal Declaratory Judgment Act, 28 U.S.C.A. §§ 2201, 2202, seeking declaratory and preliminary and permanent injunctive relief against the defendants—the Borough of Middletown, Harry Judy, the Mayor of Middletown, Steven Mrakovich, the Chief of Police of Middletown, and George Merkel, Middletown Borough Manager. Federal jurisdiction is predicated upon 28 U.S.C.A. § 1343. Specifically, plaintiffs request the court to declare unconstitutional and enjoin the enforcement of a juvenile curfew ordinance of the Borough of Middletown.

In an earlier decision, the court denied defendants' motion to dismiss the complaint finding that this case presents a justiciable controversy under Article III of the Constitution which the plaintiffs have standing to litigate, and the court denied plaintiffs' motion for a preliminary injunction on the basis of the abstention doctrine. *Bykofsky v. Borough of Middletown*, M.D.Pa.1975, 389 F.Supp. 836. The court also noted in that decision that no relief would be granted with respect to one of the defendants—the Borough of Middletown —because the Borough is not a "person" within the meaning of 42 U.S.C.A. § 1983 and therefore not subject to suit under the Civil Rights Act.

After the court denied plaintiffs' request for a preliminary injunction and defendants' motion to dismiss the action, the Borough of Middletown enacted a new juvenile curfew ordinance which re-placed the one then in effect. Subsequently, plaintiffs filed a "motion for supplemental pleadings" pursuant to Rule 15(d) of the Federal Rules of Civil Procedure and a "motion for amended supplemental complaint" pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, both which the court granted, thereby enabling plaintiffs to challenge the new ordinance in this action.

The court having previously decided that it should abstain from the issuance of preliminary and permanent injunctive relief, the case is presently before the court on plaintiffs' request for a declaratory judgment holding unconstitutional the new criminal ordinance of Middletown which imposes a curfew on minors under the age of eighteen. The trial on the merits was held on May 15, 1975, at which evidence was adduced with respect to the validity of the Borough's curfew.

The curfew ordinance[2] prohibits any minor under the age of eighteen from being on or remaining in or upon the streets within the Borough of Middletown between the hours of 10:00 P.M. (minors under twelve years of age), 10:30 P.M. (minors twelve or thirteen years of age), or 11:00 P.M. (minors fourteen through seventeen years of age) and 6:00 A.M., unless the minor comes within one of the following exceptions:

(a) The minor is accompanied by a parent (defined to include a legal guardian, a person who stands in loco parentis, or a person to whom legal custody has been given by court order);

(b) The minor is accompanied by an adult authorized by the parent to take the parent's place in accompanying the

---

Existing state authority is of little assistance in analyzing the constitutional problems involved since the particular ordinances which were approved or rejected do not contain many features which might serve as significant points for distinguishing the valid from the invalid regulatory scheme. Moreover, many of the decisions are conclusory in nature and engage in only a cursory analysis of the federal constitutional questions. For a general discussion of curfew enactments and cases adjudicating their validity, see Annot., 59 ALR3d 321 (1974). *See also* Note, Curfew Ordinances and the Control of Nocturnal Juvenile Crime, 107 University of Pennsylvania Law Review 66 (1958).

2. The text of the curfew ordinance is set forth in the appendix at the end of the memorandum.

minor for a designated period of time and specific purpose within a specified area;

(c) The minor is exercising first amendment rights protected by the Constitution, such as free exercise of religion, freedom of speech, and the right of assembly, provided the minor first has given notice to the Mayor of the Borough by delivering to the communications center personnel at the Borough Municipal Building a written communication signed by the minor and countersigned if practicable by a parent of the minor which specifies when, where, in what manner, and for what first amendment purpose the minor will be on the streets at night during the curfew time period;

(d) In a case of reasonable necessity but only after the minor's parent has communicated to the Middletown police station personnel "the facts establishing such reasonable necessity relating to specified streets at a designated time for a described purpose including points of origin and destination";

(e) The minor is on the sidewalk of his residence, or on the sidewalk of either next-door neighbor, so long as the neighbor does not object to the minor's presence on his sidewalk;

(f) The minor is returning home by a direct route from, and within thirty minutes of the termination of, a school activity or an activity of a religious or other voluntary association, provided prior notice of said activity and the place and probable time of termination has been given in writing to the Chief of Police or the officer assigned by him on duty at the police station;

(g) The minor has been authorized, by special permit obtained from the Mayor, to be on the streets during the curfew hours for normal or necessary nighttime activities inadequately provided for by other exceptions in the ordinance;

(h) The minor is a member of a group of minors permitted by a "regula-tion" issued by the Mayor to be on the streets during the curfew hours for normal or necessary nighttime activities inadequately provided for by other exceptions in the ordinance, there being too many persons involved for use of the individualized permit procedure of exception (g) above;

(i) The minor carries a certified card of employment;

(j) The minor is in a motor vehicle with parental consent for normal travel, with interstate travel through Middletown excepted in all cases from the curfew;

(k) A minor is seventeen years of age and is excepted from the curfew by "formal rule" promulgated by the Mayor excepting designated minors, minors in a defined group or area, or all minors seventeen years of age.

The ordinance further provides that it is unlawful for a parent having legal custody of a minor knowingly to permit or by inefficient control to allow such minor to be on or remain upon the street in violation of the curfew. "Knowingly" is defined as including knowledge which a parent should reasonably be expected to have concerning the whereabouts of a minor in his legal custody. When the police find a minor in prima facie violation of the curfew, the ordinance provides that the minor shall be taken to the police station, the parent called, and the parent and minor interrogated to determine the relevant facts, after which the minor is to be released to the parent's custody. If the parent cannot be located or fails to take charge of the minor, the juvenile is released to the juvenile authorities.

In the case of a first violation by a minor, the police send his parents by certified mail written notice of the violation, warning them that further violations will result in imposition of the penalty provided for in the ordinance. Upon a second violation, a fine of twenty-five dollars plus costs of prosecution is imposed upon the parents, with the

fine increasing in twenty-five dollar increments for each successive violation. Refusal to pay the fine and costs results in imprisonment in the Dauphin County prison for a period not to exceed ten days. Any minor who violates the curfew ordinance more than three times shall be reported by the Mayor to a society or organization whose purpose it is to take charge of incorrigibles and delinquents and proceedings shall then be taken, under the Juvenile Act, 11 P.S. § 50–101 et seq., before the juvenile court for the treatment, supervision, and rehabilitation of the minor.

The Mayor is authorized in the curfew ordinance to give advisory opinions, in writing, which are binding with respect to the interpretation of the ordinance. The ordinance states that a constitutional construction is intended and shall be given, and provides for continuing evaluation and updating of the enactment by the Borough council. Finally, the ordinance contains a very specific and detailed severability provision which states that severability is intended throughout and within the provisions of the ordinance.

Plaintiffs contend that the curfew ordinance: (1) is unconstitutionally vague; (2) violates the substantive due process rights of minors, specifically, the right to freedom of movement, to go where one pleases, and to use the public streets in a way that does not interfere with the personal liberty of others; (3) violates the first amendment guarantees of freedom of speech, freedom of association, and freedom of assembly; (4) violates the fundamental right of interstate travel; (5) violates the constitutional right of intrastate travel; (6) impermissibly encroaches on the constitutional right of parents to direct the upbringing of their children and violates the constitutional guarantee of family autonomy; and (7) is violative of the equal protection clause of the fourteenth amendment. Plaintiffs' contentions will be considered *seriatim.*

## VAGUENESS

■■ A legislative enactment which either forbids or requires the doing of an act in language so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law—to wit, providing fair warning and notice of what is prohibited or required so that one may act accordingly. *Connally v. General Construction Co.,* 1926, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322; *Lanzetta v. New Jersey,* 1939, 306 U.S. 451, 453, 59 S.Ct. 618, 83 L.Ed. 888; *Coates v. City of Cincinnati,* 1971, 402 U.S. 611, 614, 91 S.Ct. 1686, 29 L.Ed.2d 214; *Papachristou v. City of Jacksonville,* 1972, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110; *Grayned v. City of Rockford,* 1972, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222; *Smith v. Goguen,* 1974, 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605. "No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids." *Lanzetta v. New Jersey,* 1939, 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888. In addition, laws must provide reasonably clear standards for law enforcement officials and triers of fact in order to prevent arbitrary and discriminatory enforcement. *Smith v. Goguen,* supra; *Grayned v. City of Rockford,* supra; *Papachristou v. City of Jacksonville,* supra; *Coates v. City of Cincinnati,* supra; *Interstate Circuit v. Dallas,* 1968, 390 U.S. 676, 684–685, 88 S.Ct. 1298, 20 L.Ed.2d 225; *Shuttlesworth v. Birmingham,* 1965, 382 U.S. 87, 90–91, 86 S.Ct. 211, 15 L.Ed.2d 176. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, *Grayned v. City of Rockford,* 408 U.S. at 108–109, 92 S.Ct. 2294, and vague standards result in erratic and arbitrary application based on individual impressions and personal predilections, *Interstate Circuit v. Dallas,* 390 U.S. at 684–685, 88 S.Ct.

1298. Legislation must not be so vague, the language so loose, as to leave to those who have to apply it too wide a discretion. Legislation which is ambiguous, imprecise, and vague "does not provide for government by clearly defined laws, but rather for government by the moment-to-moment opinions of a policeman on his beat." *Shuttlesworth v. City of Birmingham,* 1965, 382 U.S. 87, 90, 86 S.Ct. 211, 213, 15 L.Ed.2d 176.

Mindful of these values which the void for vagueness doctrine is designed to protect, the court turns to plaintiffs' challenge to the provisions of the curfew ordinance. Plaintiffs' vagueness argument centers on the language contained in the exceptions that permit minors to be on the streets under certain circumstances during the curfew hours.

▮ Plaintiffs contend that Section 5(d) of the ordinance which allows a minor to be on the streets during the curfew time period in a case of "reasonable necessity" is unconstitutionally vague. In *Cameron v. Johnson,* 1968, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182, the Supreme Court upheld the constitutionality of a statute which prohibited "picketing . . . in such a manner as to obstruct or unreasonably interfere with free ingress or egress to and from any . . . county . . . courthouses . . . ." The Court stated:

". . . The terms 'obstruct' and 'unreasonably interfere' plainly require no 'guess[ing] at [their] meaning.' Appellants focus on the word 'unreasonably.' It is a widely used and well understood word and clearly so when juxtaposed with 'obstruct' and 'interfere.' We conclude that the statute clearly and precisely delineates its reach in words of common understanding. . . ." (Footnotes omitted.)

The word "unreasonable" seems to have been well understood by the framers of the Constitution when they used it in the fourth amendment, where it remains and is enforced to this day. A jury in a criminal case is instructed it must find the defendant guilty beyond a reasonable doubt, and the reasonableness standard pervades the law of torts. In *Nash v. United States,* 1913, 229 U.S. 373, 33 S. Ct. 780, 57 L.Ed. 1232, the Court, in an opinion by Justice Holmes, sustained as a sufficiently definite criminal standard the "rule of reason" of the Sherman Anti-Trust Act. In *Edgar A. Levy Leasing Co. v. Siegel,* 1922, 258 U.S. 242, 42 S.Ct. 289, 66 L.Ed. 595, the Court upheld in a civil context state rent control legislation which allowed as a defense to a landlord's action his tenant's showing that the rent charged was "unjust and unreasonable." In *United States v. Ragen,* 1942, 314 U.S. 513, 62 S.Ct. 374, 86 L.Ed. 383, the Court sustained a conviction for federal income tax evasion predicated upon the defendant having taken a deduction which violated the statutory mandate that only a "reasonable allowance for salaries" might be excluded from taxable income. "Reasonable" is juxtaposed with "necessity" in Section 5(d). "Necessity" is defined as the quality or state of fact of being in difficulties or in need, a condition arising out of circumstances that compels to a certain course of action. Webster's Third New International Dictionary (Unabridged)(1963). In *United States v. Vuitch,* 1971, 402 U.S. 62, 91 S.Ct. 1294, 28 L.Ed.2d 601, the Court held that a statute which prohibited abortions except when "necessary for the preservation of the mother's life or health" was not unconstitutionally vague. This court concludes that the curfew exception for "reasonable necessity" is not impermissibly vague. *Accord: People v. Walton,* 1945, 70 Cal. App.2d Supp. 862, 161 P.2d 498. To strike down this exception would remove from the ordinance a desirable flexibility that enables the law to be applied in a rational manner to any given situation, including circumstances not now foreseeable. "Reasonable necessity" is a widely used and well understood phrase that constitutes an ascertainable, fixed standard.

Plaintiffs challenge Section 5(g) of the ordinance which empowers the Mayor to issue a special permit to a minor to carry with him which authorizes the minor to be upon the streets during the curfew hours. Section 5(g) authorizes the Mayor to issue such a permit "[w]hen normal or necessary night-time activities of a minor, particularly a minor well along the road to maturity, may be inadequately provided for by other provisions of this ordinance . . . ." Plaintiffs contend that this standard is unconstitutionally vague. Plaintiffs also object on the basis of vagueness to that part of Section 5(g) which states that the Mayor may grant the special permit "[u]pon the Mayor's finding of necessity for the use of the streets to the extent warranted by a written application . . ." and that ". . . the Mayor may grant a permit in writing for the use of such minor of such streets at such hours as in the Mayor's opinion may reasonably be necessary . . . ." For the reasons stated supra, the court rejects plaintiffs' contention that the phrases "necessary night-time activities," "[u]pon the Mayor's finding of necessity for the use of the streets," and "as in the Mayor's opinion may reasonably be necessary," as used in the above quoted parts of Section 5(g), are impermissibly vague. The concepts of reasonableness and necessity constitute constitutionally permissible standards.

Plaintiffs also focus on the phrase "normal . . . night-time activities" as used in Section 5(g). The court agrees that the word "normal" in this context is unconstitutionally vague. "Normal" is defined as according to, constituting, or not deviating from an established norm, rule, or principle, as conforming to a type, standard, or regular pattern. Webster's Third New International Dictionary (Unabridged) (1963). The curfew ordinance fails to set forth any guidelines as to what is to be deemed "normal" nighttime activity for minors. Nightwalking simply for exercise or enjoyment is not abnormal, yet it is apparent the ordinance proscribes this conduct by the unaccompanied minor during the curfew hours. Thus, this exception to the curfew ordinance, with the inclusion of the word "normal," places almost unfettered discretion in the hands of the Mayor, who is given no guidance in the ordinance as to what constitutes "normal" nocturnal juvenile activity within the underlying purposes of the ordinance. *See Papachristou v. City of Jacksonville,* 1972, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110. Therefore, the word "normal" is unconstitutionally vague.

Likewise the court holds that the phrase "a minor well along the road to maturity" as used in Section 5(g) is impermissibly vague. The ordinance does not specify what indicia of maturity the Mayor is to use in applying this exception. Therefore, as with "normal" nighttime activities, the Mayor is left to his own personal predilections and beliefs.

The ordinance has a severability clause which states that severability is intended throughout *and within* the provisions of the curfew ordinance. *See* Section 9. It also has another provision, Section 5(1), which reemphasizes severability with respect to the curfew exceptions, both internally and as regards the rest of the ordinance. Therefore, Section 5(g) with the deletion of the word "normal" and the phrase "particularly a minor well along the road to maturity" is constitutional. The exception contained in Section 5(g) will be limited to necessary nighttime activities with no consideration of the "maturity" of the minor by the Mayor in deciding whether to grant a special permit, although what is a necessary nighttime activity can still vary with the age of the minor.

Plaintiffs also attack on vagueness grounds Section 5(h), which empowers the Mayor to promulgate a general "regulation" allowing the use of the streets for the same reasons a special permit would issue under Section 5(g) but

where too many persons are involved for the use of the individualized permit procedure. For the same reasons set forth previously, the court upholds the constitutionality of "reasonable necessity," "necessary night-time activities," and "reasonably necessary" as used in Section 5(h). Likewise the court declares "normal" nighttime activities impermissibly vague, thus limiting Section 5(h) like Section 5(g) to necessary nighttime activities.

■■ The court agrees with plaintiffs that the additional requirement set forth in Section 5(h) that the Mayor issue a regulation if " . . . consistent with the public interest . . . " is unconstitutionally vague. This confers upon the Mayor virtually unbridled discretion to deny requests for regulations and allows him to be guided by his own personal concept of "public interest" in deciding whether to promulgate a regulation since there are no standards embodied in the ordinance for guidance. *See Shuttlesworth v. Birmingham,* 1969, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162. Thus the court holds that the Mayor may not refuse to issue a regulation on the ground that it is inconsistent with the public welfare, although he may refuse to do so on the basis that the issuance of a regulation would be inconsistent with the purposes of the curfew ordinance, which are set forth in Section 2.

With the deletion of "normal" nighttime activities and "consistent with the public interest," Section 5(h) as so modified, pursuant to the severability provisions of the ordinance, is constitutional.

■ Plaintiffs next challenge the word "normal" as used in Section 5(j), which provides that a juvenile is excepted from the curfew "[w]hen the minor is, with parental consent, in a motor vehicle. This contemplates normal travel. . . . [T]his clearly exempts bona fide interstate movement through Middletown, particularly on normal routes such as the Pennsylvania Turnpike, Route 230 (Main Street), Vine Street to connect with Route 283, Route 441 or at times Ann Street and the Wilson Street bridge." The court believes that in this context the word "normal" is not vague. "Normal travel" refers to travel *otherwise permitted* by an exception to the curfew which is undertaken by motor vehicle, to *interstate* travel beginning or ending in Middletown, or to interstate travel passing through Middletown. Likewise the phrase "normal routes," referring to normal routes of interstate travel, is clear in meaning in the context of Section 5(j). Thus the court holds that Section 5(j) clearly delineates its reach in words of common understanding and is not impermissibly vague.

■ Plaintiffs argue that Section 5(k), which empowers the Mayor by "formal rule" to except designated minors, minors in a defined group or area, or all minors seventeen years of age from the curfew provisions, contains the following vague standards: (1) when it is in the "best interests of said minors and of the Borough," (2) makes a finding that the minors have attained "a sufficient degree of maturity," and (3) makes a finding "that the Curfew Ordinance should be relaxed as an incentive to and recognition of approaching maturity." The court agrees with plaintiffs that the latter two phrases pertaining to "a sufficient degree of maturity" and "as an incentive to and recognition of approaching maturity" are impermissibly vague for the same reasons stated previously with respect to Section 5(g): there is no indicia of maturity set forth in the ordinance for the Mayor to utilize and hence his personal predilections and values will govern instead of fixed standards. The court rejects, however, plaintiffs' assertion that "best interests of said minors and of the Borough" is impermissibly vague. While taken from its context the phrase may be meaningless, within the framework of the curfew ordinance and, specifically, the text of Section 5(k) it is obvious that the "best interests of said minors and of the Borough" is governed by and given meaning by the underlying purposes of

the ordinance which have been set forth in Section 2 of the ordinance. In short, the Mayor is directed to promulgate a "formal rule" only if the purposes of the ordinance will be furthered. With the deletion of the aforementioned two phrases pertaining to "maturity," Section 5(k) is constitutional.

Finally, plaintiffs challenge on the ground of vagueness one word used in the general text of the ordinance: they argue that the definition of "remain" set forth in Section 3(d) is ambiguous and hence the ordinance is vague. "Remain" is defined in Section 3(d) as "to stay behind, to tarry and to stay unnecessarily upon the streets, including the congregating of groups (or of interacting minors) totalling four or more persons in which any minor involved would not be using the streets for ordinary and serious purposes such as mere passage or going home." Section 3(d) then goes on to state that the word "remain" is used in a sense that makes the curfew ordinance the "remaining" type rather than "a mere prohibitory or presence type."

■ First, the court notes that whether the statutory language of a curfew ordinance prohibits "remaining" or "being" on the streets is insignificant because "remain" and "to be" are generally given synonymous interpretations at the enforcement level for the obvious reason they have as a practical matter in the curfew context no intelligible difference in meaning, and a judicial determination on this ground as to the validity of an ordinance is mere semantics and untenable. *See,* Note, Curfew Ordinances And The Control Of Nocturnal Juvenile Crime, 107 University of Pennsylvania Law Review 66, 98–100 (1958). In short, this court apprehends no significant difference with respect to meaning or constitutional validity between a "prohibitory or presence" type curfew and a "remaining" type curfew. Attempts to define words in terms of one type of curfew or the other is meaningless and can be confusing.

■ While the definition of "remain" set forth in Section 3(d) is cumbersome and more complex than need be, it is not unconstitutionally vague. Section 4 clearly states that it shall be unlawful for any person subject to the curfew " . . . to be or remain in or upon the streets within the Borough." Thus it is self-evident that a minor during the curfew hours must not be upon the streets of the Borough, unless he qualifies under one of the several exceptions set forth in the ordinance, and then he may be on the street only to the extent permitted by the exception. Therefore, the word "remain" as defined and used in the ordinance is not impermissibly vague.

In summary, the court holds that the curfew ordinance, with the aforementioned word and phrase deletions from curfew exceptions contained in Sections 5(g), 5(h) and 5(k), is not unconstitutionally vague. The ordinance prohibits minors of specific age groups from being on the streets of the Borough during clearly specified hours unless they are accompanied by a parent or otherwise qualify under one of the numerous exceptions. The exceptions are necessarily couched in language which classify the types of activities and the kinds of circumstances which are outside the proscription of the ordinance, it being impossible to compile an all-inclusive list of every factual situation which would warrant a minor being present on the streets during the curfew hours. The ordinance clearly gives fair warning as to what is proscribed and through mayoral advisory opinions (see Section 9) provides a means for the citizenry to determine officially in any given factual situation what is prohibited. Cf. *Cox v. Louisiana,* 1965, 379 U.S. 559, 568–569, 85 S.Ct. 476, 13 L.Ed.2d 487 ("near" the courthouse not impermissibly vague, particularly in light of on-the-spot administrative interpretation by officials charged with enforcing statute upon which demonstrators could rely). The ordinance contains no broad invitation to subjective or discriminatory enforce-

ment and does not deposit unbridled or unlimited discretion in the hands of law enforcement officials.

■■■ The Constitution does not require impossible standards. *United States v. Petrillo*, 1947, 332 U.S. 1, 7–8, 67 S.Ct. 1538, 91 L.Ed. 1877; *see Roth v. United States*, 1957, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498. A more precise articulation of what the curfew ordinance intends would be most difficult, if possible at all, and the values which the void for vagueness doctrine furthers are adequately protected by this ordinance. Indeed the precision seemingly demanded by plaintiffs with respect to this curfew ordinance would, if deemed constitutionally required, make it next to impossible to draft any curfew ordinance, or for that matter, *any* criminal statute. It will always be true that the fertile legal "imagination can conjure up hypothetical cases in which the meaning of [disputed] terms will be in nice question." *American Communications Assn. v. Douds*, 1950, 339 U.S. 382, 412, 70 S. Ct. 674, 691, 94 L.Ed. 925. Furthermore, as Justice Holmes observed, "[t]he law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree. If his judgment is wrong, not only may he incur a fine or a short imprisonment . . . ; he may incur the penalty of death." *Nash v. United States*, 1913, 229 U.S. 373, 377, 33 S.Ct. 780, 781, 57 L.Ed. 1232. In short, laws expressed in words of general applicability ultimately must be applied to specific factual circumstances. Thus, while there must be definiteness and ascertainable standards so that men of common intelligence can apprehend the meaning of the ordinance, perfect precision is neither possible nor constitutionally required. "Condemned to the use of words, we can never expect mathematical certainty from our language." *Grayned v. City of Rockford*, 408 U.S. at 110, 92 S.Ct. at 2300. The court holds that the Middletown curfew ordinance is not impermissibly vague.

## SUBSTANTIVE DUE PROCESS RIGHTS OF THE MINOR

The Supreme Court has not yet articulated the special factors that determine how existing frameworks for analyzing the rights of adults are to be applied to minors. While the Court has recognized that minors are persons under the Constitution "possessed of fundamental rights which the State must respect," *Tinker v. Des Moines Independent Community School District*, 1969, 393 U.S. 503, 511, 89 S.Ct. 733, 739, 21 L.Ed.2d 731, it has dealt explicitly only with first amendment rights, *Tinker v. Des Moines Independent Community School District*, supra, (symbolic speech); *West Virginia State Bd. of Education v. Barnette*, 1943, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (mandatory flag salute), equal protection claims, *Brown v. Board of Education*, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (school desegregation), and procedural due process questions, *Breed v. Jones*, 1975, 421 U.S. 519, 95 S.Ct. 1779, 44 L.Ed.2d 346 (minor is put in jeopardy at juvenile court adjudicatory hearing and hence double jeopardy clause of fifth amendment prohibits his prosecution for same offense as an adult); *Goss v. Lopez*, 1975, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (right to notice and informal hearing before suspension or expulsion from school); *McKeiver v. Pennsylvania*, 1971, 403 U.S. 528, 91 S.Ct. 1976, 29 L. Ed.2d 647 (no right to jury trial in juvenile court proceedings); *In re Winship*, 1970, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (proof beyond reasonable doubt necessary for conviction of minors in juvenile proceedings); *In re Gault*, 1967, 387 U.S. 1, 87 S.Ct. 1428, 18 L. Ed.2d 527 (minors have right to notice, counsel, confrontation, cross-examination, and privilege against self-incrimination in juvenile court proceedings); *Gallegos v. Colorado*, 1962, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (inadmissibility of involuntary confessions against minors); *Haley v. Ohio*, 1948, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (same as

*Gallegos*), all arising in the context of the educational system or juvenile court proceedings. The Court has refrained from analyzing the "totality of the relationship of the minor and the State." *Ginsberg v. New York*, 1968, 390 U.S. 629, 636, 88 S.Ct. 1274, 1279, 20 L.Ed.2d 195, *citing In re Gault*, 1967, 387 U.S. 1, 13, 87 S.Ct. 1428, 18 L.Ed.2d 527.

■ However, it is apparent that the constitutional rights of adults and juveniles are not co-extensive. In *McKeiver v. Pennsylvania*, 1971, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647, the Court declined to impose the right to a jury trial on juvenile court proceedings thereby denying to minors a fundamental right of the adult criminal justice system. First amendment rights of minors are not "co-extensive with those of adults." *Tinker v. Des Moines Independent Community School District*, 1969, 393 U.S. at 515, 89 S.Ct. at 741 (Stewart, J., concurring). "[A] state may permissibly determine that, at least in some precisely delineated areas, a child —like someone in a captive audience—is not possessed of that full capacity for individual choice which is the presupposition of First Amendment guarantees." *Ginsberg v. New York*, 1968, 390 U.S. at 649–650, 88 S.Ct. at 1286 (Stewart, J., concurring). In assessing whether a minor has the requisite capacity for individual choice the age of the minor is a significant factor. *See Rowan v. Post Office Dept.*, 1970, 397 U.S. 728, 741, 90 S.Ct. 1484, 25 L.Ed.2d 736 (Brennan, J., concurring). "The state's authority over children's activities is broader than over like actions of adults" and " . . . the mere fact a state could not wholly prohibit this form of adult activity . . . does not mean it cannot do so for children"; " . . . with reference to the public proclaiming of religion, upon the streets and in other similar public places, the power of the state to control the conduct of children reaches beyond the scope of its authority over adults, as is true in the case of other freedoms . . . ." *Prince v. Massachusetts*, 1944, 321 U.S. 158, 168, 170, 64 S.Ct. 438, 443, 88 L.Ed. 645. Thus this court holds that the conduct of minors may be constitutionally regulated to a greater extent than those of adults.

■ The rights of locomotion, freedom of movement, to go where one pleases, and to use the public streets in a way that does not interfere with the personal liberty of others are basic values "implicit in the concept of ordered liberty" protected by the due process clause of the fourteenth amendment. *United States v. Wheeler*, 1920, 254 U.S. 281, 293, 41 S.Ct. 133, 65 L.Ed. 270; *see Griswold v. Connecticut*, 1965, 381 U.S. 479, 500, 85 S.Ct. 1678, 14 L.Ed.2d 510 (Harlan, J., concurring); *Palmer v. City of Euclid*, 1971, 402 U.S. 544, 546, 91 S.Ct. 1563, 29 L.Ed.2d 98 (Stewart, J., concurring); *cf. Cox v. Louisiana*, 1965, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471; *Coates v. City of Cincinnati*, 1971, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214; *Shuttlesworth v. City of Birmingham*, 1965, 382 U.S. 87, 86 S.Ct. 211, 15 L.Ed.2d 176; *Cox v. Louisiana*, 1968, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487; *Cox v. New Hampshire*, 1941, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049; *Edwards v. California*, 1941, 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119; *Crandall v. Nevada*, 73 U.S. (6 Wall.) 35, 18 L.Ed. 744 (1867). One may be on the streets even though he is there merely for exercise, recreation, walking, standing, talking, socializing, or any other purpose that does not interfere with other persons' rights. As the Supreme Court stated in *United States v. Wheeler*, 1920, 254 U.S. 281, 293, 41 S.Ct. 133, 134, 65 L.Ed. 270:

"In all the states, from the beginning down to the adoption of the Articles of Confederation the citizens thereof possessed the fundamental right, inherent in citizens of all free governments, peacefully to dwell within the limits of their respective states, to move at will from place to place therein, and to have free ingress thereto and egress therefrom, with a consequent authority in the States to

forbid and punish violations of this fundamental right. *Corfield v. Coryell,* 4 Wash.C.C. 371, 380, 381, Fed. Cas.No.3,230; *Slaughterhouse Cases,* 83 U.S. (16 Wall.) 36, 76, 21 L.Ed. 394."

No right is more sacred, or is more carefully guarded, by the liberty assurance of the due process clause than the right of every citizen to the possession and control of his own person, free from restraint or interference by the state. The makers of our Constitution conferred, as against the government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized man. *Union Pacific Railway Company v. Botsford,* 1891, 141 U.S. 250, 251, 11 S.Ct. 1000, 35 L.Ed. 734; *Olmstead v. United States,* 1928, 277 U.S. 438, 478, 48 S.Ct. 564, 72 L.Ed. 944 (Brandeis, J., dissenting). Uninhibited movement is essential to freedom. *Baker v. Bindner,* W.D.Ky.1967, 274 F.Supp. 658, 662; *see Aptheker v. Secretary of State,* 1964, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992.

However, personal freedoms are not absolute, and the liberty guaranteed by the due process clause implies absence of arbitrary interferences but not immunity from reasonable regulations. *Gere v. Stanley,* 3 Cir. 1971, 453 F.2d 205, *aff'g* M.D.Pa.1970, 320 F.Supp. 852; *see Zeller v. Donegal School District Board of Education,* 3 Cir. 1975, 517 F.2d 600.

Thus, the question is whether the curfew ordinance is reasonable, with reasonableness being determined by weighing the legitimate interests of the state which the ordinance actually furthers against the competing liberty interests of the minor. This interest balancing-means test requires the court to weigh the governmental interests against the burden upon the minor's rights of freedom of movement and use of the public streets, and to examine the ordinance to insure that it in fact furthers the asserted governmental interests.

 The ordinance was enacted to further the following Borough interests:

(1) the protection of the younger children in Middletown from each other and from other persons on the street during the nighttime hours; (2) the enforcement of parental control of and responsibility for their children; (3) the protection of the public from nocturnal mischief by minors; and (4) reduction in the incidence of juvenile criminal activity. The court must decide whether the curfew actually advances these governmental interests. In exercising its police power, the state must further the "public health, safety, morals and general welfare" if its actions are not to be considered an arbitrary deprivation of liberty. *See Euclid v. Amber Realty,* 1926, 272 U.S. 365, 47 S.Ct. 114, 71 L. Ed. 303; *Village of Belle Terre v. Boraas,* 1974, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797.

Obviously, the ordinance in fact promotes the safety of younger children by keeping them off the streets after 10:00 P.M. unless accompanied by an adult. It is also apparent that the ordinance, which imposes criminal penalties on the parent, encourages parents to supervise, control, and know the whereabouts of their children during the nighttime hours. The curfew undoubtedly inhibits the nocturnal accumulation of juveniles on the public streets with its attendant risk of mischief, and the ordinance prevents youths from aimlessly roaming the streets or congregating on street corners. Chief of Police Mrakovich testified that the principal complaints received by the Middletown police from the inhabitants of the Borough against juveniles under the age of eighteen during the nighttime hours were vandalism, prowling, loud noise, and disorderly conduct. The court can take judicial notice of the rapidly increasing crime rate among juveniles and that teenagers commit a high percentage of all serious crime. Indeed, plaintiffs' own expert witness, Dr. Thomas Rush, who had an expertise in criminology and sociology, testified that in 1970 youths under eighteen years of age accounted

for 25% of all arrests during the night-time hours. Chief of Police Mrakovich testified that the incidence of nocturnal juvenile crime was particularly high and increasing among persons sixteen and seventeen years of age. The police records introduced in evidence at the trial (see defendants' Exhibits Nos. 1 and 2) indicate that while there was a decrease in crime during curfew hours for both minors and adults, there was a greater relative decrease for the minors who are subject to the curfew. These records also corroborate Chief Mrakovich's testimony that there has been a high incidence of and increase in crime among sixteen and seventeen year olds in the last three years. Thus the evidence adduced at trial indicates that the curfew ordinance makes a substantial contribution to the alleviation of nocturnal juvenile criminal activity. The court, however, notes that as a practical matter the effectiveness of a curfew in achieving this objective is impossible to ascertain with scientific certainty.[3] However, even in the absence of any statistical data, it is apparent that some juvenile crime is prevented, such as the "spur-of-the-moment" nocturnal crime and mischief resulting from group or gang action, because accumulations of juveniles are easily detected and can be dispersed under the curfew. Moreover, the underlying assumption that likelihood of criminal activity decreases as the amount of control exercised by parents over the activities of their children increases is not an unreasonable tenet. The greater the breakdown in the social structure of the family unit or the greater the parental neglect, then the greater the chance of anti-social behavior by the minor. Thus, to the extent the curfew induces parents, under the pain of imposition of a criminal penalty, to exercise their control where they otherwise might allow their children freer rein and ignore their nighttime whereabouts and activi-ties, it is effective in decreasing nocturnal juvenile crime and mischief and in strengthening the family unit.

For the foregoing reasons, the court concludes that the ordinance does in fact further the purposes for which it was enacted. Therefore, there is a rational relation between the end sought and the means chosen.

To determine whether the curfew ordinance is a reasonable exercise of the Borough's police power and thus constitutional, the court must balance the minor's constitutional right to freedom of movement and his concomitant constitutionally protected interest to be upon and use the public streets during the nighttime hours under circumstances other than those provided for in the curfew exceptions against the aforementioned governmental interests advanced by the ordinance.

■ The interest of minors in being abroad during the nighttime hours included in the curfew is not nearly so important to the social, economic, and healthful well-being of the community as the free movement of adults. *In Re C,* 1972, 28 Cal.App.3d 747, 105 Cal.Rptr. 113, 118–119. Moreover, the ordinance contains numerous exceptions that allow minors to be on the streets during the curfew hours when they have a specific, important, legitimate purpose for being there or if they are accompanied by a parent. The community has a special interest in the protection of children of immature years. Because of their lack of mature judgment, minors are subject to the continuing control and supervision of parents or guardians until they become of age or are emancipated. Minors are deprived of many privileges and rights—e. g., the fundamental right to vote, to enlist in the military forces, to contract, to operate motor vehicles, to purchase or consume alcoholic beverages, to work at certain jobs, or to marry

---

3. For a discussion of the problem of determining the effectiveness of a curfew ordinance, see Note, Curfew Ordinances and the Control of Nocturnal Juvenile Crime, 107 University of Pennsylvania Law Review 66, 95–97 (1958).

without parental consent. The state has a legitimate interest in protecting the moral, emotional, mental, and physical welfare of the minor and the safety, peace, and order of the community. *See Stanley v. Illinois,* 1972, 405 U.S. 645, 652, 92 S.Ct. 1208, 31 L.Ed.2d 551; *Wisconsin v. Yoder,* 1972, 406 U.S. 205, 230, 92 S.Ct. 1526, 32 L.Ed.2d 15. The curfew ordinance recognizes the dangers to which minors are subject if allowed at nighttime to be upon the streets unattended by adults. Legislation peculiarly applicable to minors is necessary for their proper protection. Likewise, due to their immaturity, legislation peculiarly applicable to minors is warranted for the protection of the public, e. g., to protect the community from youths aimlessly roaming the streets during the nighttime hours.

■ The Supreme Court has recognized that the activities and conduct of minors upon the street may be regulated and restricted to a greater extent than those of adults. In *Prince v. Massachusetts,* 1944, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645, the Court upheld the constitutionality of a statute which prohibited minors from selling upon the streets or in other public places newspapers, magazines, periodicals, or other articles of merchandise even if accompanied by their parents. The Court, in rejecting the contention of a Jehovah Witness guardian that to prohibit her child from selling religious literature on the street was a violation of the first amendment and a denial of equal protection, reasoned as follows:

"Concededly a statute or ordinance identical in terms with section 69, except that it is applicable to adults or all persons generally, would be invalid. *Young v. California,* 308 U.S. 147, [60 S.Ct. 146, 84 L.Ed. 155]; *Nichols v. Massachusetts,* 308 U.S. 147, [60 S.Ct. 146, 84 L.Ed. 155]; *Jamison v. Texas,* 318 U.S. 413 [63 S.Ct. 669, 87 L.Ed. 869]; *Murdock v. Pennsylvania,* 319 U.S. 105 [63 S.Ct. 870, 87 L.Ed. 1292, 146 A.L.R. 81]; *Martin v. City of Struthers,* 319 U.S. 141 [63 S.Ct. 862, 87 L.Ed. 1313]. *But the mere fact a state could not wholly prohibit this form of adult activity, whether characterized locally as a 'sale' or otherwise, does not mean it cannot do so for children.* Such a conclusion granted would mean that a state could impose no greater limitation upon child labor than upon adult labor. Or, if an adult were free to enter dance halls, saloons, and disreputable places generally, in order to discharge his conceived religious duty to admonish or dissuade persons from frequenting such places, so would be a child with similar convictions and objectives, if not alone then in the parent's company, against the state's command.

"*The state's authority over children's activities is broader than over like actions of adults. This is peculiarly true of public activities and in matters of employment.* A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens, with all that implies. It may secure this against impeding restraints and dangers, within a broad range of selection. Among evils most appropriate for such action are the crippling effects of child employment, more especially in public places, *and the possible harms arising from other activities subject to all the diverse influences of the street.* It is too late now to doubt that legislation appropriately designed to reach such evils is within the state's police power, whether against the parent's claim to control of the child or one that religious scruples dictate contrary action.

"*It is true children have rights, in common with older people, in the primary use of highways. But even in such use streets afford dangers for them not affecting adults.* And in other uses, whether in work or in other things, this difference may be magnified. This is so not only when children are unaccompanied but certainly

to some extent when they are with their parents. *What may be wholly permissible for adults therefore may not be so for children, either with or without their parents' presence."* 321 U.S. at 167–169, 64 S.Ct. at 443. (Footnotes omitted.) (Emphasis supplied.)

The court holds that the minor's interest in freedom of movement upon the streets during the nighttime curfew hours under circumstances other than those provided for in the numerous curfew exceptions is clearly outweighed by the governmental interests which the ordinance furthers. Hence the ordinance is a reasonable exercise by the Borough of its police power to advance and protect the safety and welfare of the general community and the minors who reside therein. The ordinance is a constitutionally permissible regulation of the minor's right to freedom of movement upon and use of the streets as guaranteed by the due process clause of the fourteenth amendment.

## FIRST AMENDMENT RIGHTS OF THE MINOR

Plaintiffs' contention that the ordinance violates the minor's first amendment rights of free speech, free association, and free assembly is without merit. Section 5(c) of the ordinance contains an exception to the curfew for the bona fide exercise of first amendment rights for political, religious, or communicative purposes. Contrary to plaintiffs' argument, there is no prior restraint of these first amendment freedoms since the minor need not first obtain a permit to utilize this curfew exception. Rather the minor need only deliver before exercising such rights on the street during the curfew hours written notice signed by the minor, and a parent where practicable, to the communications center personnel at the Borough Municipal Building specifying when, where, and in what manner said minor will be on the streets during the curfew time period exercising a first

amendment right specified in the communication. This required giving of notice cannot be equated with prior restraint. Section 5(c) does not empower the Borough officials to deny permission to be on the streets for the excepted first amendment purposes; no written or verbal permission from anyone need be obtained in order to be on the streets to exercise these first amendment freedoms. Of course, if the law enforcement officials determine at the time the minor is actually on the street during the curfew hours allegedly pursuant to the first amendment exception that his conduct does not fall within this exception, the minor can be taken into custody for violating the ordinance. But this would be an "arrest" after the fact, not a prior restraint.

A fairly administered notice provision restricts only slightly first amendment rights of assembly, association, and free expression without affecting in any way the content. The Borough has a legitimate interest in the reasonable control of its streets. In *Cox v. New Hampshire,* 1941, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049, the Supreme Court upheld the constitutionality of a statute which *prohibited* parades without a special license, an enactment which was more restrictive than the mere notice provisions of the curfew ordinance in the case *sub judice.* The Court stated in a unanimous decision:

"Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses. The authority of a municipality to impose regulations in order to assure the safety and convenience of the people in the use of public highways has never been regarded as inconsistent with civil liberties but rather as one of the means of safeguarding the good order upon which they ultimately depend. The control of travel on the streets of cities is the most familiar illustration of

this recognition of social need. Where a restriction of the use of highways in that relation is designed to promote the public convenience in the interest of all, it cannot be disregarded by the attempted exercise of some civil right which in other circumstances would be entitled to protection. . . . As regulation of the use of the streets for parades and processions is a traditional exercise of control by local government, the question in a particular case is whether that control is exerted so as not to deny or unwarrantedly abridge the right of assembly and the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places. . . . The defendants, said the court, 'had a right, under the Act, to a license to march when, where and as they did, if after a required investigation it was found that the convenience of the public in the use of the streets would not thereby be unduly disturbed, upon such conditions or changes in time, place and manner as would avoid disturbance'.

"If a municipality has authority to control the use of its public streets for parades or processions, as it undoubtedly has, it cannot be denied authority to give consideration, without unfair discrimination, to time, place and manner in relation to the other proper uses of the streets. We find it impossible to say that the limited authority conferred by the licensing provisions of the statute in question as thus construed by the state court contravened any constitutional right." 312 U.S. at 574, 576, 61 S.Ct. at 765.

In *Cox v. Louisiana,* 1965, 379 U.S. 559, 563, 85 S.Ct. 476, 480, 13 L.Ed.2d 487, in upholding the validity of a statute which prohibited picketing "near" a courthouse, the Court reasoned:

"Nor does such a statute infringe upon the constitutionally protected rights of free speech and free assembly. The conduct which is the subject of this statute—picketing and parading—is subject to regulation even though intertwined with expression and association. The examples are many of the application by this Court of the principle that certain forms of conduct mixed with speech may be regulated or prohibited. The most classic of these was pointed out long ago by Mr. Justice Holmes: 'The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic.' *Schenck v. United States,* 249 U.S. 47, 52 [39 S.Ct. 247, 63 L.Ed. 470]. A man may be punished for encouraging the commission of a crime, *Fox v. Washington,* 236 U.S. 273 [35 S.Ct. 383, 59 L.Ed. 573], or for uttering 'fighting words,' *Chaplinsky v. New Hampshire,* 315 U.S. 568 [62 S.Ct. 766, 86 L.Ed. 1031]. This principle has been applied to picketing and parading in labor disputes. See *Hughes v. Superior Court,* 339 U.S. 460 [70 S.Ct. 718, 94 L.Ed. 985]; *Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490 [69 S.Ct. 684, 93 L.Ed. 834]; *Building Service Employees v. Gazzam,* 339 U.S. 532 [70 S. Ct. 784, 94 L.Ed. 1045]. But cf. *Thornhill v. Alabama,* 310 U.S. 88 [60 S.Ct. 736, 84 L.Ed. 1093]. These authorities make it clear, as the Court said in *Giboney,* that 'it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.' *Giboney v. Empire Storage & Ice Co., supra,* [336 U.S.] at 502 [69 S.Ct. 684]."

In *Poulos v. New Hampshire,* 1953, 345 U.S. 395, 73 S.Ct. 760, 97 L.Ed. 1105, the Court sustained the constitutionality of a city ordinance which forbade the holding of a religious meeting in a public park without a license, said ordinance having been construed by the State Su-

preme Court as leaving to the licensing officials no discretion as to the granting of licenses, no power to discriminate, and no control over speech but as merely calling for the adjustment of the unrestricted exercise of religion with the reasonable comfort and convenience of the whole city. The Court reasoned as follows:

"*The principles of the First Amendment are not to be treated as a promise that everyone with opinions or beliefs to express may gather around him at any public place and at any time a group for discussion or instruction.* It is a *non sequitur* to say that First Amendment rights may not be regulated becuase they hold a preferred position in the hierarchy of the constitutional guarantees of the incidents of freedom. This Court has never so held and indeed has definitely indicated the contrary. It has indicated approval of reasonable nondiscriminatory regulation by governmental authority that preserves peace, order and tranquillity without deprivation of the First Amendment guarantees of free speech, press and the exercise of religion. . . ." 345 U.S. at 405, 73 S.Ct. at 766. (Footnote omitted.)(Emphasis supplied.)

In view of the foregoing, it is apparent that the curfew ordinance, with its notice requirement set forth in Section 5(c), does not unconstitutionally infringe on the first amendment right of minors to gather on public streets for *political, religious,* or *expressive* purposes.

■ Plaintiffs also contend that the ordinance violates the first amendment guarantee of freedom of association for *social* purposes because Section 5(c) does not except from the curfew conduct social in nature, such as being on the street simply to socialize or talk with other youths. For the same reasons set forth in the preceding section dealing with the substantive due process rights of minors, the court holds that the minor's first amendment right to gather on the public streets during the nighttime curfew hours for *social* purposes is outweighed by the governmental interests furthered by the ordinance.

■ Finally, the ordinance plainly does not regulate speech at all. Any impingement on speech is incidental to the "nonspeech" purposes furthered by the ordinance. When "speech" and "nonspeech" elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element justifies the incidental limitations on first amendment freedoms. *United States v. O'Brien,* 1968, 391 U.S. 367, 376, 88 S. Ct. 1673, 20 L.Ed.2d 672.

The Court sustained in *United States v. O'Brien,* supra, the constitutionality of the federal law which makes it a criminal violation to forge, alter, knowingly destroy, knowingly mutilate, or in any manner change one's selective service registration certificate (i. e., "draft card"). The Court upheld the conviction of O'Brien who had burned his draft card before a sizable crowd in order to influence others to adopt his antiwar beliefs. In rejecting O'Brien's claim that his act of burning the draft card was protected "symbolic speech" within the first amendment, the Court stated:

"We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea. However, even on the assumption that the alleged communicative element in O'Brien's conduct is sufficient to bring into play the First Amendment, it does not necessarily follow that the destruction of a registration certificate is constitutionally protected activity. This Court has held that when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment free-

doms. To characterize the quality of the governmental interest which must appear, the Court has employed a variety of descriptive terms: compelling; substantial; subordinating; paramount; cogent; strong. Whatever imprecision inheres in these terms, we think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest. . . .

". . .

". . . In other words, both the governmental interest and the operation of the 1965 Amendment are limited to the noncommunicative aspect of O'Brien's conduct. The governmental interest and the scope of the 1965 Amendment are limited to preventing harm to the smooth and efficient functioning of the Selective Service System. When O'Brien deliberately rendered unavailable his registration certificate, he wilfully frustrated this governmental interest. For this noncommunicative impact of his conduct, and for nothing else, he was convicted." 391 U.S. at 376–377, 381–382, 88 S.Ct. at 1678. (Footnotes omitted.) Likewise the governmental interests underlying and the operation of the curfew ordinance are limited to *noncommunicative* conduct, and any conviction under the ordinance will be for pure conduct and not for any communication or speech integral to or connected with the conduct. The curfew ordinance clearly does not suppress or impermissibly regulate freedom of speech.

For the foregoing reasons the court concludes that the ordinance is not overbroad as to its restrictions on first amendment freedoms.

## THE MINOR'S RIGHT TO TRAVEL

▆▆ Plaintiffs assert that the curfew unconstitutionally encroaches on the minor's fundamental right to interstate travel. While the right of interstate travel has repeatedly been recognized as a basic constitutional freedom, *Sosna v. Iowa*, 1975, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532; *Memorial Hospital v. Maricopa County*, 1974, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306; *Dunn v. Blumstein*, 1972, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274; *Shapiro v. Thompson*, 1969, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600; *United States v. Wheeler*, 1920, 254 U.S. 281, 41 S.Ct. 133, 65 L.Ed. 270, Section 5(j) of the ordinance exempts "bona fide interstate movement through Middletown" and "interstate travel beginning or ending in Middletown." Therefore, it is apparent that the ordinance in no way impinges on the right to interstate travel.

▆▆ Plaintiffs argue that the minor's right to *intrastate* travel, specifically within the Borough, is violated. In essence, this contention is nothing more than a rephrasing of plaintiffs' argument with respect to the minor's right to freedom of movement upon the public streets. The juvenile's travel is restricted only to the extent it does not fall within one of the numerous exceptions to the curfew. For the reasons set forth previously in the substantive due process section, the court holds that the governmental interests furthered by the curfew ordinance overrides the minor's constitutional right to intrastate travel. That a balancing test is the proper mode of analysis in dealing with the right to travel is apparent from the Supreme Court's recent decision in *Sosna v. Iowa*, 1975, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532, wherein the Court upheld the constitutionality of a one-year residency requirement in Iowa's divorce statute. The Court found the state's interest in requiring that those who seek a divorce from its courts be genuinely attached to the state, as well as

the desire to insulate its divorce decrees from the likelihood of collateral attack, sufficient to justify the impingement on the right to travel. The Court's mode of analysis is not that of searching for a compelling state interest but rather one of balancing the state's interests against the right to travel.

For the foregoing reasons the court holds that the ordinance does not unconstitutionally impinge on the minor's right to travel.

## THE RIGHTS OF THE PARENT

 Plaintiffs contend that the curfew ordinance unconstitutionally interferes with the right of parents to rear their children as they see fit and that the ordinance's proscription on nighttime juvenile activity cannot be sustained against the wishes of the child's parents.

The Constitution protects the right of parents to direct their children's upbringing and family autonomy against state interference. In *Meyer v. Nebraska*, 1923, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042, the Court protected the right of parents to have their children taught a foreign language, finding state interference with that right to be unwarranted. In *Pierce v. Society of Sisters*, 1925, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070, the Court held that a state statute requiring school-age children to be sent to public schools, thereby forbidding their education in private schools, unconstitutional as an unreasonable interference with the liberty of parents to raise their children as they see fit. In *Wisconsin v. Yoder*, 1972, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15, the Court found that the right of Amish parents to direct the religious training of their offspring prevailed over the state's interest in having children remain in school until the age of sixteen. In *Stanley v. Illinois*, 1972, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551, the Court held that an unwed father, upon the death of the mother, was entitled to a hearing on his fitness as a parent before his children could be taken from him and that the state could not merely presume that unmarried fathers in general are unsuitable and neglectful parents but must so establish on the basis of individualized proof. The integrity of the family unit has found protection against governmental interference in the due process clause of the fourteenth amendment, *Cleveland Board of Education v. LaFleur*, 1974, 414 U.S. 632, 639–640, 94 S.Ct. 791, 39 L.Ed.2d 52; *Roe v. Wade*, 1973, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147; *Griswold v. Connecticut*, 1965, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510; *Meyer v. Nebraska*, 262 U.S. at 399, 43 S.Ct. 625, the equal protection clause of the fourteenth amendment, *Skinner v. Oklahoma*, 1942, 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655, and the ninth amendment, *Griswold v. Connecticut*, 1965, 381 U.S. 479, 496, 85 S.Ct. 1678, 14 L.Ed.2d 510 (Goldberg, J., concurring).

Nevertheless, the right of the parent to direct the upbringing of his children and the right to family autonomy are not absolute. When actions concerning the child have a relation to the public welfare or the well-being of the child, the state may act to promote these legitimate interests. In *Stanley v. Illinois*, 405 U.S. at 652, 92 S.Ct. at 1213, the Court stated:

"For its part, the State has made its interest quite plain: Illinois has declared that the aim of the Juvenile Court Act is to protect 'the moral, emotional, mental, and physical welfare of the minor and the best interests of the community' and to 'strengthen the minor's family ties whenever possible, removing him from the custody of his parents only when his welfare or safety or the protection of the public cannot be adequately safeguarded without removal . . .' Ill.Rev.Stat., c. 37, § 701–2. These are legitimate interests, well within the power of the State to implement. We do not quesion the assertion that

neglectful parents may be separated from their children."

In *Prince v. Massachusetts*, 1944, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645, the Court dealt specifically with the right of the state to interfere with the religious practices of parents in raising their children. In rejecting the guardian's contention that the state could not prohibit the child's presence on the street accompanied by her guardian, to sell religious literature, the Court reasoned:

" . . . It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder. *Pierce v. Society of Sisters, supra.* And it is in recognition of this that these decisions have respected the private realm of family life which the state cannot enter.

"But the family itself is not beyond regulation in the public interest, as against a claim of religious liberty. *Reynolds v. United States,* 98 U.S. 145, [25 L.Ed. 244]; *Davis v. Beason,* 133 U.S. 333 [10 S.Ct. 299, 33 L.Ed. 637]. And neither rights of religion nor rights of parenthood are beyond limitation. *Acting to guard the general interest in youth's well being, the state as parens patriae may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor and in many other ways.* Its authority is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience. Thus, he cannot claim freedom from compulsory vaccination for the child more than for himself on religious grounds. The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death. *People v. Pierson,* 176 N.Y. 201, 68 N.E. 243, 63 L.R.A. 187, 98 Am.St.

Rep. 666. The catalogue need not be lengthened. It is sufficient to show what indeed appellant hardly disputes, *that the state has a wide range of power for limiting parental freedom and authority in things affecting the child's welfare; and that this includes, to some extent, matters of conscience and religious conviction.*

" . . .

"Street preaching, whether oral or by handing out literature, is not the primary use of the highway, even for adults. While for them it cannot be wholly prohibited, it can be regulated within reasonable limits in accommodation to the primary and other incidental uses. But, for obvious reasons, notwithstanding appellant's contrary view, the validity of such a prohibition applied to children not accompanied by an older person hardly would seem open to question. The case reduces itself therefore to the question whether the presence of the child's guardian puts a limit to the state's power. That fact may lessen the likelihood that some evils the legislation seeks to avert will occur. But it cannot forestall all of them. The zealous though lawful exercise of the right to engage in propagandizing the community, whether in religious, political or other matters, may and at times does create situations difficult enough for adults to cope with and wholly inappropriate for children, especially of tender years, to face. Other harmful possibilities could be stated, of emotional excitement and psychological or physical injury. Parents may be free to become martyrs themselves. But it does not follow they are free, in identical circumstances, to make martyrs of their children before they have reached the age of full and legal discretion when they can make that choice for themselves. Massachusetts has determined that an absolute prohibition, though one limited to streets and public places and to the incidental uses proscribed, is necessary to accomplish its legitimate objectives. Its

power to attain them is broad enough to reach these peripheral instances in which the parent's supervision may reduce but cannot eliminate entirely the ill effects of the prohibited conduct. *We think that with reference to the public proclaiming of religion, upon the streets and in other similar public places, the power of the state to control the conduct of children reaches beyond the scope ⸀f its authority over adults, as is true in the case of other freedoms, and the rightful boundary of its power has not been crossed in this case."* 321 U.S. at 166–167; 169–170, 64 S.Ct. at 442. (Footnotes omitted.) (Emphasis supplied.)

Thus, in cases in which harm to the physical or mental health of the child or to the public safety, peace, order, or welfare is demonstrated, these legitimate state interests may override the parents' qualified right to control the upbringing of their children. *See Wisconsin v. Yoder,* 406 U.S. at 230, 92 S.Ct. 1526; *Application of President and Directors of Georgetown College, Inc.,* 1964, 118 U.S.App.D.C. 80, 331 F.2d 1000, 1007–1010, *cert. denied,* 1964, 377 U.S. 978, 84 S.Ct. 1883, 12 L.Ed.2d 746; *In re Sampson,* 1972, 29 N.Y.2d 900, 328 N.Y. S.2d 686, 278 N.E.2d 918; *People ex rel. Wallace v. Labrenz,* 1952, 411 Ill. 618, 104 N.E.2d 769, *cert. denied,* 1952, 344 U.S. 824, 73 S.Ct. 24, 97 L.Ed. 642; *Raleigh Fitkin-Paul Memorial Hospital v. Anderson,* 1964, 42 N.J. 421, 201 A.2d 537; *In re Clark,* 1962, 21 Ohio Op.2d 86, 185 N.E.2d 128; *cf. Green Appeal,* 1972, 448 Pa. 338, 292 A.2d 387.

■ The court holds that the curfew ordinance does not impermissibly impinge on the parents' constitutional right to direct the upbringing of their children. The ordinance does not dictate to the parent an over-all plan of discipline for the minor. With its numerous exceptions, including the one that permits the juvenile to be on the streets during the curfew hours if accompanied by a parent, the ordinance constitutes a minimal interference with the parental interest in influencing and controlling the activities of their offspring. Mindful of the fact that the parent's right of control is a qualified right and that the ordinance furthers several important governmental interests, including those of keeping juveniles from roaming the streets without adult supervision during the nighttime hours and imposing a duty on parents to know the whereabouts and activities of their children at night, it is clear that the ordinance fosters in a constitutional manner the welfare of both minors and the general community. The parents' constitutionally protected interest with respect to the upbringing of their children, upon which the ordinance infringes only minimally, is outweighed by the Borough's interest in protecting immature minors and in controlling and preventing nocturnal juvenile mischief and crime.

## EQUAL PROTECTION

■ There remains plaintiffs' contention that the curfew ordinance violates the equal protection clause of the fourteenth amendment. The equal protection clause requires that persons similarly circumstanced be treated the same by the law unless there is a legitimate basis for treating them differently. In deciding whether state action unconstitutionally classifies, the Supreme Court has articulated two essentially distinct tests for deciding equal protection claims. *See, e. g., San Antonio Independent School District v. Rodriguez,* 1973, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16. The traditional test requires that state action must be upheld if there is a reasonable basis for the classification and the basis is rationally related to the achievement of a legitimate state interest. *San Antonio ·Independent School District v. Rodriguez,* supra; *Dandridge v. Williams,* 1970, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491; *McDonald v. Board of Election Commissioners of Chicago,* 1969, 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739; *Morey v. Doud,* 1957, 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed. 2d 1485. If, however, the state action affects a "fundamental" right or creates a "suspect" grouping, the state action

will be carefully and meticulously scrutinized in search of the requisite compelling state interest. *Hill v. Stone,* 1975, 421 U.S. 289, 95 S.Ct. 1637, 44 L.Ed.2d 172; *Dunn v. Blumstein,* 1972, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274; *Graham v. Richardson,* 1971, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534; *Cipriano v. City of Houma,* 1969, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647; *Shapiro v. Thompson,* 1969, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600; *Skinner v. Oklahoma,* 1942, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655. In addition, it should be noted that while the Supreme Court has expressly reserved the issue, its mode of analysis in sex classification cases suggests that it has adopted an intermediate equal protection test which results in the Court upholding a state enactment so long as there is actual proof that the asserted state interest is furthered, thereby imposing on the government a heavier burden with respect to justification of a gender classification than the traditional reasonable basis test, since the state must produce evidence that the classification *actually* furthers the asserted state purposes, but the state need not show a compelling governmental interest.[4] *See Stanton v. Station,* 1975, 421 U.S. 7, 95 S.Ct. 1373, 43 L.Ed.2d 688; Weinberger v. Wiesenfeld, 1975, 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514; *Taylor v. Louisiana,* 1975, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690; *Schlesinger v. Ballard,* 1975, 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610; *Geduldig v. Aiello,* 1974, 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256; *Kahn v. Shevin,* 1974, 416 U.S. 351, 94 S.Ct. 1734, 40 L.Ed.2d 189; *Frontiero v. Richardson,* 1973, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583; *Reed v. Reed,* 1971, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225.

The court has already held that the curfew ordinance does not impinge on the exercise of "fundamental" rights. Unlike a classification based upon race,[5] alienage,[6] and national origin,[7] which are inherently suspect, age is not a suspect classification. *Cf. Oregon v. Mitchell,* 1970, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed. 272. Therefore, since the curfew ordinance does not infringe upon a fundamental right and does not create a suspect classification, the traditional rational basis test is the proper yardstick to utilize in determining the constitutionality of the ordinance.

Under traditional rational basis equal protection analysis, a legislative classification must be sustained unless it is patently arbitrary or bears no rational relationship to a legitimate governmental interest. The court has already held that the curfew ordinance does further the purposes for which it was enacted and hence there is a rational relationship between the legitimate ends sought and the means chosen.

The age classification embodied in the ordinance is not arbitrary but rather rests on real and substantial differences between adults and minors which bear a just and reasonable relation to the statutory purposes of the enactment. Minors are a class founded on natural and intrinsic distinctions from adults— notably degree of maturity—and the court believes the state is free to give differential treatment to adults and youths based on inherent and practical differences, said differences having al-

4. This court applied the intermediate equal protection test in sustaining the constitutionality of a prison hair regulation which restricted only male, and not female, hair length and style against a claim the regulation was violative of equal protection. *Poe v. Werner,* M.D.Pa.1974, 386 F.Supp. 1014.

5. *See Loving v. Virginia,* 1967, 388 U.S. 1, 11, 87 S.Ct. 1817, 18 L.Ed.2d 1010; *McLaughlin v. Florida,* 1964, 379 U.S. 184, 191–192, 85 S.Ct. 283, 13 L.Ed.2d 222.

6. *See Graham v. Richardson,* 1971, 403 U.S. 365, 372, 91 S.Ct. 1848, 29 L.Ed.2d 534.

7. *See Oyama v. California,* 1948, 332 U.S. 633, 644–646, 68 S.Ct. 269, 92 L.Ed. 249; *Korematsu v. United States,* 1944, 323 U.S. 214, 216, 65 S.Ct. 193, 89 L.Ed. 194; *Hirabuyashi v. United States,* 1943, 320 U.S. 81, 100, 63 S.Ct. 1375, 87 L.Ed. 1774.

ready been discussed *supra* in the section dealing with the substantive due process rights of minors.

It is argued, why draw the line at eighteen instead of seventeen or twenty-one or some other age. The state can draw lines in a rational manner, and it is not unreasonable for a legislative body to conclude that those eighteen years of age or older as a class have achieved a sufficient degree of maturity so that there is no need to restrict their freedom of movement upon and activities on the street during the nighttime hours. Obviously, the older the persons being regulated, the greater the burden on the state to justify the regulation in terms of reasonablness, and there would come an age beyond which a nocturnal curfew could not be constitutionally applied, absent extraordinary or emergency circumstances. *See* Comment, Judicial Control of the Riot Curfew, 77 Yale Law Journal 1560 (1968); Comment, The Riot Curfew, 57 Cal. Law Review 450 (1969). The Middletown curfew applies to all those under the age of eighteen, and a very fundamental right, namely, the right to vote, is denied to this same age group. Denial of the right to vote to those under age twenty-one was implicitly upheld as constitutional in *Oregon v. Mitchell*, 1970, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272. In addition, youths under the age of eighteen have traditionally been regulated and restricted by American law in many ways: they generally lack the power to contract, to marry without parental consent, to own a gun, to purchase or consume alcoholic beverages, to operate a motor vehicle, or to work at certain jobs, and they are not held responsible for deviant behavior criminally as an adult. On all these items the states have leeway to raise or lower the age requirements, *see Oregon v. Mitchell*, 1970, 400 U.S. at 142, 91 S.Ct. 260 (Douglas, J., concurring and dissenting), although undoubtedly there would come a point agewise beyond which the state could no longer

constitutionally regulate the aforementioned matters in the restrictive manner it does with respect to young persons.

For all the foregoing reasons, the court holds that the legislative determination in the instant case that the age of eighteen provides the dividing line between minors and adults with respect to a nighttime curfew is not unreasonable, does not create an arbitrary classification, and hence is not violative of equal protection. In addition, since the ordinance applies alike to all persons under the age of eighteen there clearly is no equal protection violation within the class subject to the curfew.

### CONCLUSION

With the deletion from the ordinance (pursuant to its severability provisions) of the words and phrases found impermissibly vague in the previous section on vagueness,[8] the court holds that the curfew ordinance is constitutional.

The foregoing shall constitute the court's findings of fact and conclusions of law.

### APPENDIX

### ORDINANCE NO. 662
### FOR THE YEAR 1975

CURFEW ORDINANCE, FOR MINORS, REGULATING USE OF STREETS DURING NOCTURNAL HOURS, AND PROVIDING FOR RELATED MATTERS SUCH AS PERMITS, REGULATIONS AND OTHER EXCEPTIONS, PARENTAL RESPONSIBILITIES, POLICE PROCEDURES, PENALTIES, CONSTRUCTION AND ADVISORY OPINIONS, AND CONTINUING EVALUATION AS WELL AS IMPLEMENTATION THROUGH VOLUNTARY RESEARCH AND LOCAL ACTION FOR THE PREVENTION OF JUVENILE DELINQUENCY

Borough Council of the Borough of Middletown, County of Dauphin and

8. Since the deletions narrow certain exceptions to the curfew, the ordinance as so modified imposes a somewhat more restrictive curfew.

Commonwealth of Pennsylvania enacts and ordains the following Chapter VI of its Code of Ordinances beginning at p. 32.

Section 1. *Short title.* This ordinance shall be known and may be cited as Curfew Ordinance.

Section 2. *Purposes and findings.* This is an updating of the Borough Curfew Ordinance of 1943 prescribing, in accordance with prevailing community standards, regulations for the conduct of minors on streets at night, effectively enforced, taught in the homes, internalized and adhered to for generations, all for the good of minors, for the furtherance of family responsibility, and for the public good, safety and welfare.

(a) Council finds that the curfew meets a very real local need, has been over the years a significant factor in minimizing juvenile delinquency and should be updated and amplified in the light of Middletown's local situation and facts including the following. Middletown, the oldest community in (and antedating) Dauphin County, with clearly defined boundaries at the confluence of the Susquehanna River and Swatara Creek to its south and east and crossed at the north by the Pennsylvania Turnpike, has a compact built up area largely within a mile and much of it within a half mile of its police station at the 60 W. Emaus Street Borough offices. It has, near its police station, a small central business district and a few manufacturing establishments. It is a residential community in an area traditionally classified as Pennsylvania Dutch. After 9 P.M. in this quiet community, as its people say, the sidewalks are rolled up. This community sense of the proper time for cessation of outdoor activities by minors on the streets is reflected in the curfew hours declared by this ordinance which takes into consideration also the danger hours for nocturnal crime and for accumulations of minors with potential risks incident to immaturity.

(b) Council finds that compact Middletown is not overcrowded. Population density, as reflected in the Borough Comprehensive Plan, varies by neighborhoods from 43.7 per acre to 35 to 18.4 persons per acre. The total area is 1,304.7 acres; streets occupy 228.8 acres, 163.8 acres are devoted to public and semi-public uses, residential land use predominates and single family dwellings occupy the largest portion of the residential area. The population density is 30 persons per acre in that portion of the second Ward in eastern Middletown south of E. Main Street, overlooking the Swatara Creek, now known as the Village of Pineford, a 50 acre tract where there are no public streets which the United States Government had acquired, while still undeveloped, by eminent domain proceedings in 1941; this unique 50 acre tract is a planned residential development, with high rise apartments, all owned by one firm, providing ample open spaces. Adequate indoor living space permits minors in Middletown to healthfully occupy their time. Commercial recreational facilities (1 movie) are almost nonexistent and there is little or nothing for minors to do outdoors, but roam the streets, after the curfew hours which this ordinance declares.

(c) Council finds that there are 2,841 minors, the 1970 census figure for persons under 18 years of age, residing in Middletown. There are fewer than 200 minors for each school grade. Middletown has 3 elementary schools, one in each of its 3 wards, one junior high school for grades 7 and 8 in the central second ward, and one area high school in Lower Swatara Township which adjoins Middletown on the west and north. The comparatively few minors who reside in the Village of Pineford include 32 in high school and (attending the following schools nearby in the same second ward) 25 in junior high and 112 in elementary school.

(d) Council further finds that the Middletown population (1970 census) is 9,080. There are 3,059 households (av-

eraging 2.96 persons per household) and as many heads of households. In 2,069 households there are husband and wife. Of the 2,841 minors 2,686 are classified in the 1970 census as "own child" of the head of the household in which they reside. Middletown is a stable family community. Parental responsibility for the whereabouts of children is the norm, legal sanctions to enforce such responsibility have had a demonstrated effectiveness over the years, as parental control increases likelihood of juvenile delinquency decreases and there is a continuing need for the nocturnal curfew for minors which has achieved and will continue to achieve under local conditions the purposes hereinbefore stated.

Section 3. *Definitions.* For the purposes of the Curfew Ordinance the following terms, phrases, words, and their derivations shall have the meaning given herein. When not inconsistent with the context, words used in the present tense include the future, words in the plural number include the singular and words in the singular number include the plural. The word "shall" is always mandatory and not merely directory.

(a) *Borough* is the Borough of Middletown, Dauphin County, Pennsylvania, with administrative offices at 60 W. Emaus Street, Middletown, Pa. 17057.

(b) *Minor* is any person under the age of 18, or, in equivalent phrasing often herein employed, any person 17 or less years of age.

(c) *Parent* is any person having legal custody of a minor (i) as a natural or adoptive parent, (ii) as a legal guardian, (iii) as a person who stands in loco parentis or (iv) as a person to whom legal custody has been given by order of court.

(d) *Remain* means to stay behind, to tarry and to stay unnecessarily upon the streets, including the congregating of groups (or of interacting minors) totalling four or more persons in which any minor involved would not be using the streets for ordinary or serious purposes such as mere passage or going home. To implement that thought with additional precision and precaution, numerous exceptions are expressly defined in section 5 so that this is not a mere prohibitory or presence type curfew ordinance. More and more exceptions become available with increasing years and advancing maturity as appropriate in the interest of reasonable regulation which is intended by use of the meaningful phrase "be or remain" found constitutional in *Baker v. Borough of Steelton,* 17 Dauph. 17 (1912), a decision properly classified in *Thistlewood v. Trial Magistrate for Ocean City,* 236 Md. 548, 204 A.2d 688, 691 (1964) as relating to a curfew ordinance of the "remaining" type.

(4) *Street* is a way or place, of whatsoever nature, open to the use of the public as a matter of right for purposes of vehicular travel or in the case of a sidewalk thereof for pedestrian travel. The term street includes the legal right of way, including but not limited to the cartway or traffic lanes, the curb, the sidewalks whether paved or unpaved, and any grass plots or other grounds found within the legal right of way of a street. The term street applies irrespective of what it be called or formally named, whether alley, avenue, court, road or otherwise.

(5) *Time of night* referred to herein is based upon the prevailing standard of time, whether Eastern Standard Time or Eastern Daylight Saving Time, generally observed at that hour by the public in the Borough, prima facie the time then observed in the Borough Administrative Offices and police station.

(6) *Year of Age* continues from one birthday, such as the seventeenth to (but not including the day of) the next, such as the eighteenth birthday, making it clear that 17 or less years of age is herein treated as equivalent to the phrase "under 18 years of age," the latter phrase in practice, unfortunately, having confused a number of persons into the mistaken thought that 18 year

olds might be involved. Similarly, for example, 11 or less years of age means "under 12 years of age."

Section 4. *Curfew for minors.* It shall be unlawful for any person 17 or less years of age (under 18) to be or remain in or upon the streets within the Borough of Middletown at night during the period ending at 6 A.M. and beginning

(a) at 10 P.M. for minors 11 or less years of age,

(b) at 10:30 P.M. for minors 12 or 13 years of age, and

(c) at 11 P.M. for minors 14 or more years of age.

Section 5. *Exceptions.* In the following exceptional cases a minor on a borough street during the nocturnal hours for which Section 4 is intended to provide the maximum limits of regulation (and a clear general guide for minors, their parents and their fellow-citizens) shall not, however be considered in violation of the Curfew Ordinance.

(a) When accompanied by a parent of such minor.

(b) When accompanied by an adult authorized by a parent of such minor to take said parent's place in accompanying said minor for a designated period of time and purpose within a specified area.

(c) When exercising First Amendment rights protected by the United States Constitution, such as the free exercise of religion, freedom of speech and the right of assembly. Such minor shall evidence the bona fides of such exercise by first delivering, to communications center personnel, at the Borough Municipal Building at 60 W. Emaus Street, where and by whom high priority messages to the Mayor are regularly received, a written communication, signed by such minor and countersigned if practicable by a parent of such minor with their home address and telephone number, addressed to the Mayor of the Borough, specifying when, where and in what manner said minor will be on the streets at night (during hours when the Curfew Ordinance is otherwise applicable to said minor) in the exercise of a First Amendment right specified in such communication.

(d) In case of reasonable necessity but only after such minor's parent has communicated to the Borough police station personnel the facts establishing such reasonable necessity relating to specified streets at a designated time for a described purpose including points of origin and destination. A copy of such communication, or of the police record thereof, duly certified by the Chief of Police to be correct, with an appropriate notation of the time it was received and of the names and address of such parent and minor, shall be admissible evidence.

(e) When the minor is on the sidewalk of the place where such minor resides, or on the sidewalk of either next-door neighbor not communicating an objection to the police officer.

(f) When returning home, by a direct route from (and within 30 minutes of) the termination of) a school activity, or an activity of a religious or other voluntary association, of which prior notice, indicating the place and probable time of termination, has been given in writing to, and duly filed for immediate reference by, the Chief of Police or the officer assigned by him on duty at the police station, thus encouraging (here as in other exceptional situations) conduct on the part of minors involved in such activities and striking a fair balance for any somewhat conflicting interests.

(g) When authorized, by special permit from the Mayor, carried on the person of the minor thus authorized, as follows. When normal or necessary nighttime activities of a minor, particularly a minor well along the road to maturity, may be inadequately provided for by other provisions of this ordinance, then recourse may be had to the Mayor of the Borough, either for a regulation as provided in subsection (h) or for a special permit as the circumstances warrant. Upon the Mayor's finding of necessity

for the use of the streets to the extent warranted by a written application (as judically approved in *People v. Walton,* 70 Cal.App.2d Supp. 862, 161 P.2d 498, 502–503, 1945), signed by a minor and by a parent of such minor if feasible stating (a) the name, age and address of such minor, (b) the name, address and telephone number of a parent thereof, (c) the height, weight, sex, color of eyes and hair and other physical characteristics of such minor, (d) the necessity which requires such minor to remain upon the streets during the curfew hours otherwise applicable, and (e) the street or route and the beginning and ending of the period of time involved by date and hour, the Mayor may grant a permit in writing for the use by such minor of such streets at such hours as in the Mayor's opinion may reasonably be necessary. In an emergency this may be handled by telephone, or other effective communication, with a corresponding record being made contemporaneously, either to the Mayor or if unavailable to the police officer authorized by the Mayor to act on his behalf in an emergency, at the police station.

(h) When authorized, by regulation issued by the Mayor, in other similar cases of reasonable necessity, similarly handled but adapted to normal or necessary night-time activities of more minors than can readily be dealt with on an individual special permit basis. Normally such regulation by the Mayor permitting use of the streets should be issued sufficiently in advance to permit appropriate publicity through news media and through other agencies such as the schools, and shall define the activity, the scope of the use of the streets permitted, the period of time involved not to extend more than 30 minutes beyond the time for termination of such activity, and the reason for finding that such regulation is reasonably necessary and is consistent with the public interest and the purposes of this Curfew Ordinance.

(i) When the minor carries a certified card of employment, renewable each calendar month when the current facts

so warrant, dated or re-issued not more than 45 days previously, signed by the Chief of Police and briefly identifying the minor, the addresses of his home and of his place of employment, and his hours of employment.

(j) When the minor is, with parental consent, in a motor vehicle. This contemplates normal travel. From excess of caution, this clearly exempts bona fide interstate movement through Middletown, particularly on normal routes such as the Pennsylvania Turnpike, Route 230 (Main Street), Vine Street to connect with Route 283, Route 441 or at times Ann Street and the Wilson Street bridge. This also exempts interstate travel beginning or ending in Middletown.

(k) When the minor is 17 years of age, if and when the Mayor shall have determined, by formal rule first reported to Borough Council, spread upon its minutes and so reported in the press, finding the facts as to the extent (minimal) of juvenile delinquency in such age group permitting such rule, currently, in the best interests of said minors and of the Borough, finding the facts as to a sufficient degree of maturity of those thus within one year of adulthood and finding that the Curfew Ordinance should be relaxed as an incentive to and recognition of approaching maturity, then the Mayor by such formal rule, covering a period of time designated therein or until recision thereof not exceeding one year from the date thereof, may take appropriate action excepting designated minors, minors in a defined group or area, or all minors (as the current facts may warrant) 17 years of age at that date or attaining 17 years of age during the period that such formal rule is and remains in effect.

(*l*) Each of the foregoing exceptions, and their several limitations such as provisions for notification, are severable, as hereinafter provided but here reemphasized; and additional, also severable, exceptions, broadening with the progress toward maturity of minors enrolled respectively in elementary, junior

high and high schools, will be considered by council as warranted by future experience illuminated by the views of student government associations, school personnel, citizens, associations, ward, precinct and neighborhood spokesmen, parents, officers and persons in authority concerned positively with minors as well as with juvenile delinquency.

Section 6. *Parental responsibility*. It shall be unlawful for a parent having legal custody of a minor knowingly to permit or by inefficient control to allow, such minor to be or remain upon any Borough street under circumstances not constituting an exception to, or otherwise beyond the scope of, the Curfew Ordinance. The term "knowingly" includes knowledge which a parent should reasonably be expected to have concerning the whereabouts of a minor in that parent's legal custody. It is intended to continue to keep neglectful or careless parents up to a reasonable community standard of parental responsibility through an objective test. It shall, a fortiori, be no defense that a parent was completely indifferent to the activities or conduct or whereabouts of such minor.

Section 7. *Police procedures*. A policeman of the Borough, upon finding or having attention called to any minor on the streets in prima facie violation of the Curfew Ordinance, normally shall take the minor to the Borough Police Station, where a parent shall immediately be notified to come for such minor, whereupon they shall be interrogated. This is intended to permit ascertainment, under constitutional safeguards, of relevant facts, and to centralize responsibility in the sergeant there and then on duty for accurate, effective, fair, impartial and uniform enforcement, and recording, thus making available experienced supervisory personnel, the best of facilities and access to information and records. In the absence of convincing evidence such as a birth certificate, a policeman on the street shall in the first instance use his best judgment in determining age.

(a) Police procedures shall constantly be refined in the light of experience and may provide, inter alia, that the policeman may deliver to a parent thereof a minor under appropriate circumstances, for example a minor of tender age near home whose identity and address may readily be ascertained or are known.

(b) In any event such policeman shall within 24 hours file a written report with the Chief of Police, or shall participate to the extent of the information for which he is responsible in the preparation by himself and the sergeant involved in such case, and in the filing, of such report within 24 hours.

(c) When a parent, immediately called, has come to take charge of the minor, and the appropriate information has been recorded, the minor shall be released to the custody of such parent. If the parent cannot be located, or fails to take charge of the minor, then the minor shall be released to the juvenile authorities, except to the extent that in accordance with police regulations, approved in advance by juvenile authorities, the minor may temporarily be entrusted to a relative, neighbor or other person who will on behalf of a parent assume the responsibility of caring for the minor pending the availability or arrival of a parent.

(d) In the case of a first violation by a minor the Chief of Police shall by certified mail, send to a parent written notice of said violation with a warning that any subsequent violation will result in full enforcement of the Curfew Ordinance, including enforcement of parental responsibility and of applicable penalties.

Section 8. *Penalties*. Prevailing community standards, and the real internalization thereof or interpersonal sanctions therefore that in practice count for much, as to when minors should be off the streets, reflected in this Curfew Ordinance, are hereby undergirded with the following legal sanctions.

(a) If, after the warning notice pursuant to section 7 of a first violation by

a minor, a parent violates section 6 (in connection with a second violation by said minor), this shall be treated as a first offense by the parent. For such first parental offense a parent shall be fined $25.00 and for each subsequent offense by a parent the fine shall be increased by an additional $25.00, e. g. $50.00 for the second, $75.00 for the third offense. The District Justice, upon finding a parent guilty, shall sentence the parent to pay such fine and the costs of prosecution, and upon refusal to pay such fine and costs to be imprisoned in the jail of Dauphin County for a period not exceeding ten days.

(b) Any minor who shall violate any of the provisions of the Curfew Ordinance more than three times shall be reported by the Mayor to a society or organization whose purpose it is to take charge of incorrigibles and delinquents and proceedings shall then be taken, under the Juvenile Act, 11 P.S. sec. 50–101 et seq., before the juvenile court for the treatment, supervision and rehabilitation of such minor.

(c) A like procedure, before the juvenile authorities, shall be followed in any case where the imposing of a fine or fines upon a parent shall not be effective, or where for any other reason the provisions of the Curfew Ordinance cannot be made effective by the imposing of penalties under this Section 8.

Section 9. *Construction.* Severability is intended throughout and within the provisions of the Curfew Ordinance. If any provision, including inter alia any exception, part, phrase or term, or the application thereof to any person or circumstance is held invalid, the application to other persons or circumstances shall not be affected thereby and the validity of the Curfew Ordinance in any and all other respects shall not be affected thereby. From excess of caution, the Mayor is authorized to give advisory opinions, in writing or immediately reduced to writing, which shall be binding, and shall be adhered to by the police, until the ordinance is amended in such respect, interpreting terms, phrases, parts or any provisions. Normally such advisory opinions shall be in response to good faith, signed letters addressed to him at the Borough administration building, questioning as (a) ambiguous, (b) as having a potentially chilling effect on constitutional rights specifically invoked, or (c) as otherwise invalid, in all three categories with respect to proposed conduct definitely described. This administrative remedy must be exhausted prior to presenting to any court a question in any of said three categories. Borough Council does not intend a result that is absurd, impossible of execution or unreasonable. It is intended that the Curfew Ordinance be held inapplicable in such cases, if any, where its application would be unconstitutional. A constitutional construction is intended and shall be given. Council does not intend to violate the Constitution of the Commonwealth of Pennsylvania or the Constitution of the United States of America.

Section 10. *Continuing evaluation.* Borough Council will continue its evaluation and updating of the Curfew Ordinance.

(a) Accordingly, there shall be compiled and informally reported to Borough Council through effective channels (such as the normal monthly distribution by the Borough Manager and Borough Secretary, to each councilman, the Mayor and the Borough Solicitor, of noteworthy material) all exceptional cases hereunder of reasonable necessity, the notices of school and other activities, the Mayor's special permits and the Mayor's regulations hereinbefore authorized, and the Mayor's advisory opinions, for consideration by the appropriate committee and by Borough Council in further updating and continuing evaluation of the Curfew Ordinance.

(b) For the same reasons, as well as for the implementation beyond these legal aspects of the basic purposes hereof, the Mayor and relevant committees of Borough Council through their respective chairmen in coordinated efforts shall work with existing, and may organize, voluntary groups, and shall stim-

ulate volunteer leadership, in programs of research and of action dealing constructively on neighborhood and local bases, with juvenile delinquency, and the prevention, control or containment thereof, in all its ramifications and with practicable steps toward the good life, and a better life, for minors 17 or less years of age, and with the working of the Curfew Ordinance, community-wise and in individual cases, as one much needed legal tool toward that end as well as for continuing present protection of minors and of other persons, and of property and other interests, important to the welfare of the people of the Borough of Middletown.

Section 11. *Repealer.* All ordinances and parts of ordinances inconsistent herewith are repealed. This Curfew Ordinance of 1975 specifically repeals the Curfew Ordinance of 1943, as amended, viz., the ordinance of March 8, 1943 entitled "An ordinance prohibiting, under certain conditions, any child under sixteen years of age from being in or upon the public streets, highways, alleys, parks or other public places of the Borough of Middletown after 10:30 P.M. E. S.T., defining the duties of parents or other legal custodians of such children, and providing a penalty for the violation thereof," as amended by Ordinance 309 of February 9, 1953. This Curfew Ordinance shall comprise the totality at this time of Chapter VI of the Code of Ordinances of the Borough of Middletown.

ENACTED AND ORDAINED this 10th day of March, 1975.

> BOROUGH COUNCIL OF THE BOROUGH OF MIDDLETOWN
> By /s/ E. F. Girler
> President

ATTEST:
/s/ Lucy M. Fagley
 Secretary

The foregoing Curfew Ordinance is this 10th day of March 1975, hereby approved.

> /s/ Harry H. Judy
> Mayor