Affirmed by published opinion. Chief Judge WILKINSON wrote the majority opinion, in which Judge ERVIN joined. Judge MICHAEL wrote a dissenting opinion.
OPINION
WILKINSON, Chief Judge:
This appeal involves a challenge to the constitutionality of a juvenile nocturnal curfew ordinance enacted by the City of Char-lottesville. The district court held that the ordinance did not violate the constitutional rights of minors, their parents, or other af *846 fected parties and declined to enjoin its enforcement. We agree that the ordinance is constitutional and affirm the judgment of the district court.
I.
On December 16, 1996, the Charlottesville City Council, after several months of study and deliberation, amended Section 17-7 of the City Code to enact a new juvenile nocturnal curfew ordinance. The City Council designed the curfew ordinance to:
(i) promote the general welfare and protect the general public through the reduction of juvenile violence and crime within the City;
(ii) promote the safety and well-being of the City’s youngest citizens, persons under the age of seventeen (17), whose inexperience renders them particularly vulnerable to becoming participants in unlawful activities, particularly unlawful drug activities, and to being victimized by older perpetrators of crime; and
(Hi) foster and strengthen parental responsibility for children.
Charlottesville, Va., Code § 17-7, Intro.
Effective March 1, 1997, the ordinance generally prohibits minors, defined as un-emancipated persons under seventeen, from remaining in any public place, motor vehicle, or establishment within city limits during curfew hours. The curfew takes effect at 12:01 a.m. on Monday through Friday, at 1:00 a.m. on Saturday and Sunday, and lifts at 5:00 a.m. each morning.
The ordinance does not restrict minors’ activities that fall under one of its eight enumerated exceptions. Minors may participate in any activity during curfew hours if they are accompanied by a parent; they may run errands at a parent’s direction provided that they possess a signed note. The ordinance allows minors to undertake employment, or attend supervised activities sponsored by school, civic, religious, or other public organizations. The ordinance exempts minors who are engaged in interstate travel, are on the sidewalk abutting their parents’ residence, or are involved in an emergency. Finally, the ordinance does not affect minors who are “exercising First Amendment rights protected by the United States Constitution, such as the free exercise of religion, freedom of speech and the right of assembly.” Id. § 17-7(b)(8).
The ordinance sets forth a scheme of warnings and penalties for minors who violate it. For a first violation, a minor receives a verbal warning, followed by a written warning to the minor and the minor’s parents. For subsequent violations, the minor is charged with a Class 4 misdemeanor. The ordinance also makes it unlawful for certain other individuals, including parents, knowingly to encourage a minor to violate the ordinance. The full text of the ordinance is included as an appendix to the opinion.
Plaintiffs are five minors under age seventeen who are subject to the ordinance, one eighteen-year-old, and two parents of minor children. The minors allege that, with their parents’ permission, they occasionally wish to engage in lawful activities which the curfew will not permit. These activities include attending late movies; getting a “bite to eat”; playing in a band; socializing with older siblings; and attending concerts in Richmond, which would bring them back through Char-lottesville during curfew hours. The eighteen-year-old plaintiff alleges that he has been deprived of opportunities to associate with his younger friends by the ordinance. The parent plaintiffs allege that the ordinance interferes with their decisions on which activities, at what times, are appropriate for their children.
Plaintiffs brought this action for declaratory and injunctive relief, alleging that the ordinance violates their rights under the First, Fourth, Fifth and Fourteenth Amendments. At trial, plaintiffs dismissed their Fourth Amendment claims. Following trial, by order dated May 20, 1997, the district court rejected plaintiffs’ remaining claims and denied their motion for a permanent injunction. Plaintiffs now appeal.
II.
Initially we must consider the level of scrutiny appropriate to this ease. Plaintiffs contend that the ordinance infringes mi *847 nors’ constitutional liberties and therefore should be subject to strict scrutiny. It is true that “[a] child, merely on account of his minority, is not beyond the protection of the Constitution.” Bellotti v. Baird, 443 U.S. 622, 633, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (plurality opinion) (Bellotti II). Minors enjoy some rights under the First and Fourteenth Amendments before they attain adulthood. See, e.g., Planned Parenthood of Cent. Missouri v. Danforth, 428 U.S. 52, 74, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976); Tinker v. Des Moines Indep. Community Sch. Dist., 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). At the same time, the Supreme Court has made abundantly clear that children’s rights are not coextensive with those of adults. See, e.g., Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 682, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986); Bellotti II, 443 U.S. at 634, 99 S.Ct. 3035; Ginsberg v. New York, 390 U.S. 629, 638, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968); Prince v. Massachusetts, 321 U.S. 158, 168, 64 S.Ct. 438, 88 L.Ed. 645 (1944). “Traditionally at common law, and still today, unemancipated minors lack some of the most fundamental rights of self-determination — including even the right of liberty in its narrow sense, i.e., the right to come and go at will.” Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995).
In recognition of these customary limitations, “[t]he state’s authority over children’s activities is broader than over like actions of adults.” Prince, 321 U.S. at 168, 64 S.Ct. 438. State laws do not permit children to drive a car before they reach a certain age. E.g., Va.Code Ann. § 46.2-334. Compulsory attendance laws require children to attend school. E.g., id. § 22.1-254; see also Prince, 321 U.S. at 166, 64 S.Ct. 438. Labor laws limit the opportunities of children to engage in gainful employment. E.g., Va. Code Ann. § 40.1-78; see also Prince, 321 U.S. at 166, 64 S.Ct. 438. These types of laws reflect the state’s “general interest in youth’s well being.” Id.; see also City of Dallas v. Stanglin, 490 U.S. 19, 27 & n. 4, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989); Bykofsky v. Borough of Middletown, 401 F.Supp. 1242, 1256-57 (M.D.Pa.1975), aff'd mem., 535 F.2d 1245 (3d Cir.1976).
In light of the case law, two things seem clear. First, children do possess at least qualified rights, so an ordinance which restricts their liberty to the extent that this one does should be subject to more than rational basis review. Second, because children do not possess the same rights as adults, the ordinance should be subject to less than the strictest level of scrutiny. See Carey v. Population Servs. Int'l, 431 U.S. 678, 693 n. 15, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) (plurality opinion) (when minors are involved the level of scrutiny “is apparently less rigorous than the ‘compelling state interest’ test applied to restrictions on the privacy rights of adults”); Danforth, 428 U.S. at 75, 96 S.Ct. 2831. We thus believe intermediate scrutiny to be the most appropriate level of review and must determine whether the ordinance is “substantially related” to “important” governmental interests. See United States v. Virginia, 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (quoting Mississippi University for Women v. Hogan, 458 U.S. 718, 724, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982); Wengler v. Druggists Mutual Ins. Co., 446 U.S. 142, 150, 100 S.Ct. 1540, 64 L.Ed.2d 107 (1980)). We also conclude, however, that the ordinance survives constitutional attack under either a substantial or a compelling state interest standard. The narrow means chosen by the City in the ordinance serve strong and indeed compelling public needs.
III.
A.
The text of the Charlottesville curfew ordinance identifies three legislative purposes: (1) to reduce juvenile violence and crime within the city; (2) to protect juveniles themselves from being swept up in unlawful drug activities and from becoming prey to older perpetrators of crime; and (3) to strengthen parental responsibility for children. These enumerated purposes represent important and compelling governmental .interests.
In Schall v. Martin the Supreme Court recognized that “[t]he ‘legitimate and compel *848 ling state interest’ in protecting the community from crime cannot be doubted.” 467 U.S. 253, 264, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984) (quoting De Veau v. Braisted, 363 U.S. 144, 155, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960)). Indeed it constitutes “a weighty social objective.” Brown v. Texas, 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). If government cannot ensure the safety of its citizens, it has failed them in the most fundamental sense. Schall further confirms that “this interest persists undiluted in the juvenile context,” as the social costs of crime are high no matter what the age of the perpetrator. 467 U.S. at 264-65, 104 S.Ct. 2403.
The City contends that its curfew ordinance was passed to combat the marked growth in the rate of juvenile crime both nationwide and within Virginia. During the preliminary injunction hearing Dr. William Ruefle, a criminologist expert in juvenile curfews, testified that these state and national growth trends were l’eflected in Charlottes-ville. In fact, the City produced evidence of a twenty-five percent increase in the delinquency caseload of Charlottesville’s Juvenile and Domestic Relations Court between 1991 and 1996. Given the projected increase in the nation’s juvenile population between 1995 and 2005, the problem of juvenile crime was unlikely to abate.
In addition, the City has documented two doubling features of the juvenile crime phenomenon. First, the City’s evidence on nationwide trends indicated a high rate of recidivism among juveniles and a correlation between juvenile delinquency and adult criminal activity. Thus reducing juvenile crime was a pressing first step in reducing the overall impact of crime on the community. Second, Charlottesville’s City Council was concerned about the marked increase in the violence associated with juvenile crime. As the City’s expert Dr. Ruefle stated in an affidavit submitted to the district court, “[j]u-veniles in Virginia now commit serious property crimes at twice the rate of those 18 years of age and older, and since 1990, they also commit serious violent crimes at a higher rate than adults.” In light of this evidence, Charlottesville’s first stated purpose is undeniably compelling.
Likewise, the City’s strong interest in fostering the welfare of children and protecting the youngest members of society from harm is well-established. See, e.g., Santosky v. Kramer, 455 U.S. 745, 766, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); Ginsberg, 390 U.S. at 640, 88 S.Ct. 1274; Prince, 321 U.S. at 166-67, 64 S.Ct. 438. Courts have recognized “the peculiar vulnerability of children,” Belloti II, 443 U.S. at 634, 99 S.Ct. 3035, and the Supreme Court long ago observed that “streets afford dangers for [children] not affecting adults.” Prince, 321 U.S. at 169, 64 S.Ct. 438. Those dangers have not disappeared; they simply have assumed a different and more insidious form today. Each unsuspecting child risks becoming another victim of the assaults, violent crimes, and drug wars that plague America’s cities. Given the realities of urban life, it is not surprising that courts have acknowledged the special vulnerability of children to the dangers of the streets. Nunez v. San Diego, 114 F.3d 935, 947 (9th Cir.1997); In Re Appeal in Maricopa County, Juvenile Action No. JT9065297, 181 Ariz. 69, 887 P.2d 599, 606 (1994) (Maricopa County); People in Interest of J.M., 768 P.2d 219, 223 (Colo.1989) (en banc); see also Bykofsky, 401 F.Supp. at 1257. Charlottesville, unfortunately, has not escaped these troubling realities. Two experienced City police officers confirmed to the district court that the children they observe on the streets after midnight are at special risk, of harm.
Charlottesville’s third purpose — strengthening parental responsibility for children — is also a significant interest. The City shares with parents and guardians a responsibility to protect children. Prince, 321 U.S. at 165-66, 64 S.Ct. 438; Pierce v. Society of Sisters, 268 U.S. 510, 535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). State authority complements parental supervision, and “the guiding role of parents in the upbringing of their children justifies limitations on the freedoms of minors.” Bellotti II, 443 U.S. at 637, 99 S.Ct. 3035. The Supreme Court has acknowledged “the special interest of the State” in encouraging minors to seek parental advice in making important decisions. Id. at 639, 99 S.Ct. 3035. And the Court has confirmed that the *849 state is appropriately concerned with the integrity of the family unit. Trimble v. Gordon, 430 U.S. 762, 769, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977). Therefore, like the City’s two preceding interests in reducing the incidence of juvenile crime and juvenile victimization, the City’s third aim constitutes an important governmental purpose.
B.
Conceding for the sake of argument that the curfew’s stated ends are sufficiently compelling, plaintiffs train their attack on the means by which the ordinance seeks to achieve its goals.
We agree with plaintiffs that the curfew must be shown to be a meaningful step towards solving a real, not fanciful problem. As the Supreme Court has said in the First Amendment context, the government “must do more than simply ‘posit the existence of the disease sough' to be cured.’ It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way.” Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 664, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (citations omitted). This standard, however, has never required scientific or statistical “proof’ of the wisdom of the legislature’s chosen course. Cf. Ginsberg, 390 U.S. at 642-43, 88 S.Ct. 1274 (“We do not demand of legislatures ‘scientifically certain criteria of legislation.’ ”) (quoting Noble State Bank v. Haskell, 219 U.S. 104, 110, 31 S.Ct. 186, 55 L.Ed. 112 (1911)). The Supreme Court has recognized that “[i]t is unrealistic to expect either members of the judiciary or state officials to be well versed in the rigors of experimental or statistical technique. But this merely illustrates that proving broad sociological propositions by statistics is a dubious business.” Craig v. Boren, 429 U.S. 190, 204, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). This uncertain nature of remedial legislation is no reason for courts to fashion their own cures or to scuttle those the legislature has provided. In fact, “[flederal courts have always been reluctant to question the potential effectiveness of legislative remedies designed to address societal problems.” Qutb v. Strauss, 11 F.3d 488, 493 n. 7 (5th Cir.1993).
Charlottesville was constitutionally justified in believing that its curfew would materially assist its first stated interest— that of reducing juvenile violence and crime. The City Council acted on the basis of information from many sources, including records from Charlottesville’s police department, a survey of public opinion, news reports, data from the United States Department of Justice, national crime reports, and police reports from other localities. On the basis of such evidence, elected bodies are entitled to conclude that keeping unsupervised juveniles off the streets late at night will make for a safer community. The same streets may have a more volatile and less wholesome character at night than during the day. Alone on the streets at night children face a series of dangerous and potentially life-shaping decisions. Drug dealers may lure them to use narcotics or aid in their sale. Gangs may pressure them into membership or participation in violence. “[DJuring the formative years of childhood and adolescence, minors often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them.” Bellotti II, 443 U.S. at 635, 99 S.Ct. 3035; see also Nunez, 114 F.3d at 947; Maricopa County, 887 P.2d at 606-07; In Re J.M., 768 P.2d at 223. Those who succumb to these criminal influences at an early age may persist in their criminal conduct as adults. . Whether we as judges subscribe to these theories is beside the point. Those elected officials with their finger on the pulse of their home community clearly did. In attempting to reduce through its curfew the opportunities for children to come into contact with criminal influences, the City was directly advancing its first objective of reducing juvenile violence and crime.
Plaintiffs contend that the exclusion of seventeen-year-olds from the curfew is a fatal flaw in the ordinance. They argue that this group is responsible for one-third of all crimes committed by juveniles nationwide and that excluding seventeen-year-olds from the curfew thus renders the ordinance imper-missibly underinclusive. However, the City’s *850 evidence documents a serious problem of crime among younger juveniles. In Char-lottesville in 1995 eighty percent of juvenile arrests for the most serious crimes were of children aged ten to sixteen, and in 1996 eighty-five percent of such crimes were committed by this group. Furthermore, the City’s decision to exclude seventeen-year-olds from coverage under the curfew is a legislative judgment that we are loath to second-guess. “[I]t is not the function of a court ‘to hypothesize independently on the desirability or feasibility of any possible alternative[s]’ to the statutory scheme. ‘These matters of practical judgment and empirical calculation are for [the State].’” Lalli v. Lalli, 439 U.S. 259, 274, 99 S.Ct. 518, 58 L.Ed.2d 503 (1978) (quoting Mathews v. Lucas, 427 U.S. 495, 515, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976)) (alterations in original). In exercising its legislative judgment, the City was forced to balance the law enforcement benefit of subjecting seventeen-year-olds to the curfew against the greater law enforcement burden of doing so. Weighing benefits and burdens is what legislatures are about.
Plaintiffs also dispute the effectiveness of the curfew in reducing juvenile crime. They say that the real problem of juvenile crime is not at night, but in the after school hours. Plaintiffs make much of a report entitled Juvenile Offenders and Victims: 1996 Update on Violence, Office of Juvenile Justice and Delinquency Prevention, U.S. Dep’t of Justice 27 (1996), which asserts that only seventeen percent of violent juvenile crime occurs during typical curfew hours, while twenty-two percent happens between 2:00 p.m. and 6:00 p.m. on school days. The City responds that the lower rate of late-night crime may reflect the fact that several of the South Carolina cities in the study actually had late-night curfews in effect. And with respect to conditions in Charlottes-ville before the curfew, City police officers and Charlottesville’s Commonwealth’s Attorney confirmed that the most serious crimes committed by juveniles occurred during curfew hours. Further, the City Council considered evidence that juvenile offenses occurring in Charlottesville between 11:00 p.m. and 6:00 a.m. increased by thirty-eight percent during 1995 and a further ten percent during 1996. Thus the City had reason to believe that, in both volume and severity, nighttime juvenile crime was a serious, growing problem in Charlottesville.
Charlottesville’s City Council concluded that a nighttime curfew might help curb this rising trend of juvenile crime. In making this decision, the City relied on the experience of cities like Lexington, Kentucky, where eight months of enforcing a nighttime juvenile curfew effected an almost ten percent decrease in juvenile arrests for the serious crimes of homicide, assault, l'obbery, rape, burglary, larceny, auto theft and arson. And the district court heard testimony that a curfew has the greatest chance of reducing juvenile crime in a smaller city like Char-lottesville, where juvenile crime, though a serious problem, has not yet become totally uncontrollable. Fundamentally, however, this dispute about the desirability or ultimate efficacy of a curfew is a political debate, not a judicial one. If local communities conclude that curfews are ineffective in reducing crime, too onerous to enforce, or too intrusive on the liberties of minors, then they are free to discontinue them. Yet local legislative bodies are entitled to draw their conclusions in light of experience with a curfew’s operation, and not have their efforts at reducing juvenile violence shut down by a court before they even have a chance to make a difference.
Plaintiffs also dispute that the curfew will contribute much, if anything, to protecting juveniles from crime, the City’s second objective. They deny that the streets are a particularly dangerous place for children at night, contending that the majority of crimes committed against children are committed by family members or acquaintances rather than by strangers on the street. The fact that children may be at risk at home or during the day means only that the curfew will not, unfortunately, protect juveniles from all crime. It does nothing to undermine the City’s evidence that children remain at risk of crime in the street—in fact, the City points out that in 1991 thirty-three percent of the violent crimes reported by *851 juvenile victims nationwide occurred on the street. Juvenile Offenders & Victims: A National Report, Office of Juvenile Justice and Delinquency Prevention, U.S. Dep’t of Justice 22 (1995). The Constitution certainly does not put legislatures to the choice of solving the entirety of a social problem or no part of it at all. Plyler v. Doe, 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982).
Further, the evidence presented by the City identified several special dangers of the nighttime hours: a vigorous street-level drug trade that flourishes during the late evening and early morning hours and that routinely uses children to facilitate drug transactions, thereby exposing them to a high degree of danger; the difficulties of apprehending perpetrators of crime at night, as criminal activity is less visible and less subject to monitoring by concerned neighbors and passers-by; and the increased degree of violence and seriousness of the crimes that are committed at night. The record documents that in Charlottesville in 1996 aggravated assaults were almost one and one-half times as likely to occur during curfew hours as non-curfew hours, robberies more than twice as likely to occur at these times, forcible rapes more than three times as likely during curfew hours, and incidents of drunk driving more than five times more likely to occur during curfew hours, trends that continued into the first months of 1997. By keeping children off the streets a few hours each night, the curfew reduces the exposure of children to these well-known, and well-documented harms.
Finally, plaintiffs dispute the City’s claim that the curfew will support the parental role in child-rearing, its third stated goal. They focus exclusively on the testimony of the parent plaintiffs, who clearly do not appreciate the curfew and do not welcome it as an enhancement of their authority. The City was entitled to believe, however, that a nocturnal curfew would promote parental involvement in a child’s upbringing. A curfew aids the efforts of parents who desire to protect their children from the perils of the street but are unable to control the nocturnal behavior of those children. And a curfew encourages narents who ienore their children’s nighttime activities to take a more active role in their children’s lives. See Bykofsky, 401 F.Supp. at 1255; In Re J.M., 768 P.2d at 223. Finally, the curfew assists the efforts of parents who prefer their children to spend time on their studies rather than on the streets. City law enforcement officers related anecdotal evidence that some parents actively welcome the support of the authorities in establishing baselines for their children and in enforcing reasonable limits on the freedom of their children to wander the streets in the middle of the night. And the City Council acted on the basis of surveys and testimony at public hearings reflecting widespread approval of the curfew and the support it offers to parents’ efforts to discipline their children.
C.
The Charlottesville curfew is not only “substantially related” to its stated purposes. The limited scope of the curfew and its numerous exceptions would satisfy even the strict scrutiny requirement of narrow tailoring. See Bernal v. Fainter, 467 U.S. 216, 219, 104 S.Ct. 2312, 81 L.Ed.2d 175 (1984) (narrow tailoring requires that the government use the least restrictive means to advance its goals). Plaintiffs urge, however, that we follow the lead of the Ninth Circuit, which held that San Diego’s curfew ordinance failed strict scrutiny review because the exceptions to the ordinance were not sufficiently detailed and comprehensive to make the curfew the least restrictive means of serving San Diego’s compelling ends. Nunez, 114 F.3d at 948-49.
The San Diego curfew applied to all minors under the age of eighteen, began at 10:00 p.m., and extended until “daylight immediately following.” Id. at 938. It contained four exceptions: (1) when a minor is accompanied by a parent or other qualified adult; (2) when a minor is on an emergency errand for his parent; (3) when a minor is returning from a school-sponsored activity; and (4) when a minor is engaged in employment. See San Diego, Cal., Municipal Code Art. 8, § 58.01, quoted in Nunez, 114 F.3d at 938-39.
*852 By contrast, Charlottesville’s curfew applies only to minors less than seventeen years- of age, does not begin until midnight on weekdays and 1:00 a.m. on weekends, lifts at 5:00 a.m. each morning, and contains no fewer than eight detailed exceptions. Under Charlottesville’s curfew, minors are allowed, inter alia, to remain on the sidewalk directly abutting their residences; to attend supervised activities sponsored by school, religious, public, civic or other similar organizations; to run errands for their parents; to undertake interstate travel; and to engage freely in any activity protected by the First Amendment.
The Charlottesville ordinance carefully mirrors the Dallas curfew ordinance that the Fifth Circuit found to satisfy strict scrutiny in Qutb, 11 F.3d at 490. Like the Charlottes-ville ordinance, the Dallas curfew covered fewer hours than San Diego’s and affected minors under the age of seventeen, not eighteen. In addition to exceptions for employment and emergencies and when a minor is in the presence of a parent or guardian, the curfew at issue in Qutb included a broad exception for sponsored activities, a First Amendment exception, an exception for being outside on the sidewalk adjacent to the minor’s home, and an exception for interstate travel. Id. Charlottesville’s curfew is in fact even narrower in scope than the Dallas ordinance, as it affects fewer hours each night— the Dallas curfew extended from 11:00 p.m. until 6:00 a.m. on weeknights and from 12:00 midnight to 6:00 a.m. on weekends, one hour more each day than the Charlottesville ordinance. This curfew, with its narrow scope and comprehensive list of exceptions, represents the least restrictive means to advance Charlottesville’s compelling interests. Thus, it would survive even strict scrutiny if that were the appropriate standard of review.
rv.
We next address plaintiffs’ claims that the Charlottesville ordinance violates the constitutional rights of parents. Plaintiffs assert that parents have a constitutionally protected right to direct their children’s upbringing without undue government interference. They urge that this right includes decisions whether to allow their children to engage in activities after the curfew takes effect. The ordinance interferes with this right, they conclude, by prohibiting children’s activities that have the parents’ full approval but do not fall under one of the ordinance’s eight exceptions.
Not every state restriction of a child’s freedom derivatively abridges the fundamental rights of parents. The Supreme Court has rejected the view that parents possess an unqualified right to raise children that trumps any government regulation of their children’s conduct. In Prince, the Court recognized “that the state has a wide range of power for limiting parental freedom and authority in things affecting the child’s welfare.” 321 U.S. at 167, 64 S.Ct. 438; see also Jehovah’s Witnesses in Wash. v. King County Hosp. Unit No. 1 (Harborview), 390 U.S. 598, 88 S.Ct. 1260, 20 L.Ed.2d 158 (1968) (per curiam), aff'g 278 F.Supp. 488 (W.D.Wash.1967); Bykofsky, 401 F.Supp. at 1262. Furthermore, were we to accept plaintiffs’ argument, future litigants could simply artfully plead violations of parental rights to avoid the Supreme Court’s determination that children do not possess all the freedoms of adults. Arguments based on minors’ rights to engage in particular conduct would be routinely recast as arguments based on parents’ rights to allow their children to engage in precisely the same conduct.
We are mindful that the Supreme Court has suggested in other contexts that parents may possess a fundamental right against undue, adverse interference by the state. See Wisconsin v. Yoder, 406 U.S. 205, 231, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (state compulsory high school attendance law interfered with “traditional concepts of parental control over the religious upbringing and education of their minor children”); Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (state presumption that unmarried father was unfit parent undermined “the interest of a parent in the companionship, care, custody, and management” of child); Meyer v. Nebraska, 262 U.S. 390, 400, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (state prohibition against teaching of foreign languages frustrated “the natural duty of the parent to give his children education suitable to' their sta *853 tion in life”). We do not believe, however, that cases involving a parent’s custodial rights or authority to direct a child’s education support plaintiffs’ claim. The Char-lottesville ordinance, prohibiting young children from remaining unaccompanied on the streets late at night, simply does not implicate the kinds of intimate family decisions considered in the above cases.
Finally, several of the exceptions to the Charlottesville curfew do accommodate the rights of parents. See Qutb, 11 F.3d at 496. These include the exception for minors accompanied by a parent and the exception for minors running an errand at the direction of a parent. In general, the same reasons that lead us to reject the constitutional challenges of the minor plaintiffs even under strict scrutiny apply to the claims of the parent plaintiffs. Cf. Bykofsky, 401 F.Supp. at 1264. The limited curtailment of juvenile liberty in the ordinance violates neither a minor’s nor a parent’s rights.
V.
Finally, we consider plaintiffs’ claims that various exceptions to the ordinance are unconstitutionally vague. A law is not void for vagueness so long as it “(1) establishes ‘minimal guidelines to govern law enforcement,’ and (2) gives reasonable notice of the proscribed conduct.” Elliott v. Administrator, Animal and Plant Health Inspection Serv., 990 F.2d 140, 145 (4th Cir.1993) (citation omitted). In statutes imposing criminal penalties, “the standard of certainty is higher.” Kolender v. Lawson, 461 U.S. 352, 359 n. 8, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). Yet clarity even in a criminal code can be a receding mirage. Thus the vagueness doctrine cannot “convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited.” Colten v. Kentucky, 407 U.S. 104, 110, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972).
Striking down ordinances (or exceptions to the same) as facially void for vagueness is a disfavored judicial exercise. Nullification of a law in the abstract involves a far more aggressive use of judicial power than striking down a discrete and particularized application of it. Of course there will be hard cases under any law. And of course all the particular applications of any general standard will not be immediately apparent. That is no reason, however, for courts to scrap altogether the efforts of the legislative branch. It is preferable for courts to demonstrate restraint by entertaining challenges to applications of a law as those challenges arise.
The Charlottesville ordinance provides an exception for those minors who are “exercising First Amendment rights protected by the United States Constitution, such as the free exercise of religion, freedom of speech and the right of assembly.” Charlottesville, Va., Code § 17-7(b)(8). Plaintiffs insist that this exception accords standardless discretion to law enforcement officers to decide whether or not the exception applies. According to plaintiffs, it also forces citizens to learn a complex body of constitutional law in order to comprehend its scope.
We decline to punish the City for its laudable effort to respect the First Amendment. See CISPES (Committee in Solidarity with the People of El Salvador) v. FBI, 770 F.2d 468, 474 (5th Cir.1985). A broad exception from the curfew for such activities fortifies, rather than weakens, First Amendment values. Plaintiffs basically attempt to place city councils between a rock and a hard place. If councils draft an ordinance with exceptions, those exceptions are subject to a vagueness challenge. If they neglect to provide exceptions, then the ordinance is attacked for not adequately protecting First Amendment freedoms. It hardly seems fitting, however, for courts to chastise elected bodies for protecting expressive activity. The Charlottes-ville ordinance is constitutionally stronger with that protection than without.*
*854 The First Amendment exception also does not accord unfettered discretion to law enforcement officials.. Every criminal law, of course, reposes some discretion in those who must enforce it. The mere possibility that such discretion might be abused hardly entitles courts to strike a law down. Police Chief Wolford’s deposition, relied on by plaintiffs, does not indicate an actual risk of arbitrary enforcement. In response to a question from plaintiffs’ counsel about whether a late night conversation about politics between two fifteen-year-olds in a coffee house fell within the exception for First Amendment activities, he stated: “You’re indoors, it’s a public location, I, I think technically under the ordinance it may be a violation. I doubt whether we would deal with it.” Such hedged deposition testimony about a speculative hypothetical does not demonstrate that police will enforce the curfew arbitrarily. See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 503, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982).
The First Amendment exception provides adequate notice to citizens. It is perfectly clear that core First Amendment activities such as political protest and religious worship after midnight would be protected. It is equally clear that rollerblading would not. Between these poles may lie marginal cases, which can be taken as they come. Id. at 503 n. 21.
The ordinance also provides an exception for activities sponsored by civic organizations. Plaintiffs argue that the Supreme Court found the term “civic” to be vague when it struck down an ordinance that required permits for door-to-door solicitation but exempted several groups, including “Borough Civic Groups and Organizations.” Hynes v. Mayor of Oradell, 425 U.S. 610, 621, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976). We do not read Hynes to stand for the broad proposition that any use of the term civic is per se vague. The Court in Hynes found several of the terms used to describe the exempted groups, including “Borough Civic Groups and Organizations,” to be unclear. Id. Here the language of the exception is clearer and includes activities sponsored by school and religious organizations in addition to civic organizations. Considered in this context, we believe that the City intended to give civic its ordinary meaning: “concerned with or contributory to general welfare and the betterment of life for the citizenry of a community or enhancement of its facilities.” Webster’s Third New International Dictionary (Unabridged) 412 (1961). We decline to find this everyday use of the term civic to suffer an ambiguity of constitutional magnitude. See Grayned v. City of Rockford, 408 U.S. 104, 110, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).
The ordinance also creates an exception in cases where a minor is involved in an emergency. Without citation to authority, plaintiffs pose a variety of hypothetical situations in which this exception may or may not apply. For example, they wonder whether the exception would include the need to go to a store to purchase cough medicine or a thermometer. Once again, the existence of questions at the margins does not justify striking down the exception altogether. A brief review of the exception illuminates many situations to which it plainly applies. The ordinance specifically defines emergency as “referring] to unforeseen circumstances, or the status or condition resulting therefrom, requiring immediate action to safeguard life, limb or property.” Charlottesville, Va.Code § 17-7(a). It further details that “[t]he term includes, but is not limited to, fires, natural disasters, automobile accidents, or other similar circumstances.” Id. While “[t]here is little doubt that imagination can conjure up hypothetical eases” to test the meaning of emergency, these speculative musings do not render this term unconstitutionally vague. American Communications Ass’n v. Douds, 339 U.S. 382, 412, 70 S.Ct. 674, 94 L.Ed. 925 (1950).
Plaintiffs’ vagueness claims threaten to make the drafting of a curfew ordinance an impossible task. The practical exceptions to the City’s curfew shall not provide the cause of its demise.
*855 VI.
Our dissenting colleague insists that the Charlottesville ordinance must satisfy strict scrutiny, that it is not narrowly tailored, and that it is void for vagueness. Under the dissent’s stringent application of these standards, however, no curfew ever would pass constitutional muster. In particular, no ordinance would survive the dissent’s version of strict scrutiny, which disregards the Supreme Court’s recognition that such inquiry should not be “strict in theory, but fatal in fact.” See Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 237, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (internal quotation marks omitted). Any locality in the nation that chose to enact a curfew would ultimately see it picked to death in the courts. A brief look at the dissent’s analysis indicates why this is so.
To begin with, the dissent downplays the interests of the community, namely Char-lottesville’s goals of promoting the well-being of its youngest citizens and of fostering parental responsibility. The dissent’s suggestion that these interests are compelling only when the state proceeds in a manner “supportive of the parental role,” post at 867, is not consistent with the prevalence of legislative measures (such as age limitations on drinking and on driving) that may, on occasion, frustrate the desires of individual parents. Moreover, by granting a citizen’s veto to every parent in the community, the dissent would convert the compelling interest requirement into a rule of unanimity. This high a constitutional bar is antithetical to the values of democratic innovation.
The same disablement of democratic authority is evident in the dissent’s strict reading of means. The dissent does agree that Charlottesville’s interest in reducing juvenile crime is compelling, but then subjects the curfew to an impossibly narrow tailoring standard. Tellingly, the dissent fails to point to less restrictive means that the City might have employed. Forbidding preventive measures such as curfews propels localities to the harshest of alternatives — waiting for juveniles actually to commit criminal offenses and then apprehending, prosecuting, and punishing them. Neither minors nor the City would gain from this result.
Finally, no ordinance could ever meet the precision envisioned by the dissent’s “strict vagueness standard.” Post at 871. The dissent argues that the labyrinthine nature of First Amendment doctrine requires a curfew exception drawn in labyrinthine detail. Forcing city councils to pursue such an elusive goal would prevent them from ever passing an ordinance. The vagueness doctrine’s basic notice principle does not impose such an impediment.
The Charlottesville curfew serves not only to head off crimes before they occur, but also to protect a particularly vulnerable population from being lured into participating in such activity. Contrary to the dissent’s protestation, we do not hold that every such curfew ordinance would pass constitutional muster. The means adopted by a municipality must bear a substantial relationship to significant governmental interests; the re-strietiveness of those means remains the subject of judicial review. As the district court noted, however, the curfew law in Charlottes-ville is “among the most modest and lenient of the 'myriad curfew laws implemented nationwide.” Charlottesville’s curfew, compared to those in other cities, is indeed a mild regulation: it covers a limited age group during only a few hours of the night. Its various exceptions enable minors to participate in necessary or worthwhile activities during this time. We hold that Charlottes-ville’s juvenile curfew ordinance comfortably satisfies constitutional standards.
Accordingly, we affirm the judgment of the district court. We do so in the belief that communities possess constitutional latitude in devising solutions to the persistent problem of juvenile crime,

AFFIRMED.

Appendix
AN ORDINANCE TO AMEND AND REORDAIN SECTION 17-7 OF CHAPTER 17 OF THE CHARLOTTESVILLE CITY CODE, 1990, AS AMENDED, RELATING TO A GENERAL CURFEW FOR MINORS
BE IT ORDAINED by the Council of the City of Charlottesville, Virginia that: ■
*856 1. Section 17-7 of the Code of the City of Charlottesville, 1990, as amended, is hereby amended and reordained, as follows:
Section 17-7 Curfew for Minors.
The purpose of this section is to: (i) promote the general welfare and protect the general public through the reduction of juvenile violence and crime within the City; (ii) promote the safety and well-being of the City’s youngest citizens, persons under the age of seventeen (17), whose inexperience renders them particularly vulnerable to becoming participants in unlawful activities, particularly unlawful drug activities, and to being victimized by older perpetrators of crime; and (Hi) foster and strengthen parental responsibility for children.
(a) Definitions.
As used within this section 17-7, the following words and phrases shall have the meanings ascribed to them below:
“Curfew hours” refers to the hours of 12:01 a.m. through 5:00 a.m. on Monday through Friday, and 1:00 a.m. through 5:00 a.m. on Saturday and Sunday.
“Emergency” refers to unforeseen circumstances, or the status or condition resulting therefrom, requiring immediate action to safeguard life, limb or property. The term includes, but is not limited to, fires, natural disasters, automobile accidents, or other similar circumstances.
“Establishment” refers to any privately-owned place of business within the City operated for a profit, to which the public is invited, including, but not limited to any place of amusement or entertainment. With respect to such Establishment, the term “Operator” shall mean any person, and any firm, association, partnership (and the members or partners thereof) and/or any corporation (and the officers thereof) conducting or managing that Establishment.
“Minor” refers to any person under seventeen (17) years of age who has not been emancipated by court order entered pursuant to Section 16.1-333 of the Code of Virginia, 1950, as amended.
“Officer” refers to a police or other law enforcement officer charged with the duty of enforcing the laws of the Commonwealth of Virginia and/or the ordinances of the City of Charlottesville.
“Parent” refers to:
(1)a person who is a minor’s biological or adoptive parent and who has legal custody of a minor (including either parent, if custody is shared under a court order or agreement);
(2)a person who is the biological or adoptive parent with whom a minor regularly resides;
(3) a person judicially appointed as a legal guardian of the minor; and/or
(4) a person eighteen (18) years of age or older standing in loco parentis (as indicated by the authorization of an individual listed in part(s)(l), (2) or (3) of this definition, above, for the person to assume the care or physical custody of the child, or as indicated by any other circumstances).
“Person” refers to an individual, not to any association, corporation, or any other legal entity.
“Public Place” refers to any place to which the public or a substantial group of the public has access, including, but not limited to: streets, highways, roads, sidewalks, alleys, avenues, parks, and/or the common areas of schools, hospitals, apartment houses, office buildings, transportation facilities and shops.
“Remain” refers to the following actions:
(1) to linger or stay at or upon a place; and/or
(2) to fail to leave a place when requested to do so by an officer or by the owner, operator or other person in control of that place.
“Temporary care facility” refers to a non-locked, non-restrictive shelter at which minors may wait, under visual supervision, to be retrieved by a parent. No minors waiting in such facility shall be handcuffed and/or secured (by handcuffs or otherwise) to any stationary object.
(b) It shall be unlawful for a minor, during curfew hours, to remain in or upon any Public Place within the City, to remain in any *857 motor vehicle operating or parked therein or thereon, or to remain in or upon the premises of any Establishment within the City, unless:
(1) the minor is accompanied by a parent; or
(2) the minor is involved in an emergency; or
(3) the minor is engaged in an employment activity, or is going to or returning home from such activity, without detour or stop; or
(4) the minor is on the sidewalk directly abutting a place where he or she resides with a parent; or
(5) the minor is attending an activity sponsored by a school, religious, or civic organization, by a public organization or agency, or by another similar organization or entity, which activity is supervised by adults, and/or the minor is going to or returning from such an activity without detour or stop; or
(6) the minor is on an errand at the direction of a parent, and the minor has in his or her possession a writing signed by the parent containing the following information: the name, signature, address and telephone number of the parent authorizing the errand, the telephone number where the parent may be reached during the errand, the name of the minor, and a brief description of the errand, the minor’s destination(s) and the hours the minor is authorized to be engaged in the errand; or
(7) the minor is involved in interstate travel through, or beginning or terminating in, the City of Charlottesville; or
(8) the minor is exercising First Amendment rights protected by the United States Constitution, such as the free exercise of religion, freedom of speech and the right of assembly.
(c) It shall be unlawful for a minor’s parent to knowingly permit, allow or encourage such minor to violate 17-7(b).
(d) It shall be unlawful for a person who is the owner or operator of any motor vehicle to knowingly permit, allow or encourage a violation of 17-7(b).
(e) It shall be unlawful for the Operator of any Establishment, or for any person who is an employee thereof, to knowingly permit, allow or encourage a minor to remain upon the premises of the Establishment during curfew hours. It shall be a defense to prosecution under this subsection that the Operator or employee of an Establishment promptly notified the police department that a minor was present at the Establishment after curfew hours and refused to leave.
(f) It shall be unlawful for any person (including any minor) to give a false name, address, or telephone number to any officer investigating a possible violation of this section 17-7.
(g) Enforcement.'
(1) Minors. Before taking any enforcement action hereunder, an officer shall make an immediate investigation for the purpose of ascertaining whether or not the presence of a minor in a public place, motor vehicle and/or Establishment within the City during Curfew hours is in violation of 17-7(b).
(A) If such investigation reveals that the presence of such minor is in violation of 17 — 7(b), then:
(1) if the minor has not previously been issued a warning for any such violation, then the officer shall issue a verbal warning to the minor, which shall be followed by a written warning mailed by the police department to the minor and his or her parent(s), or
(2) if the minor has previously been issued a warning for any such violation, then the officer shall charge the minor with a violation of this ordinance and shall issue a summons requiring the minor to appear in court (Ref. Va.Code § 16.1-260(H)(1)). And
(B) As soon as practicable, the officer shall:
(1) release the minor to his or her parent(s); or
(2) place the minor in a temporary care facility for a period not to exceed the remainder of the curfew hours, so *858 that his or her parent(s) may retrieve the minor; or
(3) if a minor refuses to give an officer his or her name and address, refuses to give the name and address of his or her parent(s), or if no parent can be located prior to the end of the applicable curfew hours, or if located, no parent appears to accept custody of the minor, the minor may be taken to a nonsecure crisis center or juvenile shelter and/or may be taken to a judge or intake officer of the juvenile court to be dealt with in the manner and pursuant to such procedures as required by law. {Ref. Va.Code § 16.1-260(H) (1); § 16.1-278.6; §§ 16.1-U1(A)(1)).
(2) Others. If an investigation by an officer reveals that a person has violated 17-7(c), (d) and/or (e), and if the person has not previously been issued a warning with respect to any such violation, an officer shall issue a verbal warning to the person, which shall be followed by a written warning mailed by the police department to the person; however, if any such warning has previously been issued to that person then the officer shall charge the person with a violation and shall issue a summons directing the person to appear in court.
(h)-Each violation of this section 17-7 shall constitute a Class 4 Misdemeanor.
2. Within one year after the effective date of March 1, 1997 of this ordinance, the City Manager shall review this ordinance and report and make recommendations to the City Council concerning the effectiveness of and the continuing need for the ordinance. The City Manager’s report shall specifically include the following information: (a) the practicality of enforcing the ordinance and any problems with enforcement identified by the Police Department; (b) the impact and cost of the ordinance; (c) other data and information which the Police Department believes to be relevant in assessing the effectiveness of the curfew ordinance; and (d) information from citizens regarding whether the ordinance has been administered and enforced fairly, including information regarding the age, gender and race of those charged or detained under the ordinance.
3. This ordinance shall be effective on March 1,1997, at 12:01 a.m.
Approved by Council
December 16,1996
/s/ Jeanne Cox
/s/ Jeanne Cox
/s/ Clerk of City Council

 The dissenting opinion suggests that the First Amendment exception would be improved if it included a scienter element. See post at 873. A scienter requirement might serve a beneficial narrowing function if § 17-7(b)(8) imposed criminal liability. The provision, however, provides *854 an exception from liability for persons who otherwise would be in violation of the curfew. It is not clear why the dissent would want to narrow , this safe haven by requiring minors to satisfy an additional state-of-mind requirement.